# In re Citizens Utilities Company

[769 A.2d 19]

No. 97-436

Present: Amestoy, C.J., Dooley, Morse and Skoglund, JJ., and Gibson, J. (Ret.), Specially Assigned

Opinion Filed December 15, 2000

*Martin K. Miller* and *Victoria J. Brown* of *Miller, Eggleston & Cramer, Ltd.*, Burlington, for Appellant Citizens Utilities Company.

*Geoffrey Commons*, Montpelier, for Appellee Vermont Department of Public Service.

**Dooley, J.** Citizens Utilities Company appeals from an order of the Public Service Board imposing various penalties in response to the utility's pervasive and longstanding management and operational transgressions. Specifically, Citizens challenges the Board's significant reduction in the company's allowed rate of return on equity, claiming that (1) the Board exceeded its authority by imposing the return-on-equity penalty in addition to separate statutory fines for the same offenses; (2) the evidence does not support the penalty; and (3) the return on equity and rate of return imposed by the Board results in an unconstitutional regulatory taking. We reject each of these arguments and thus affirm the Board's decision.

The Board's 309-page order resolved two distinct but interrelated dockets, the first addressing substantial allegations of misconduct and mismanagement by Citizens, and the second investigating the company's overall rates. Following forty-one days of hearings and two separate public hearings, the Board found that Citizens' rates were excessive and that the company had engaged in a decades-long course of egregious and unprecedented misconduct characterized by (1) numerous willful violations of statutes, Board orders, and its own agreements; (2) imprudent mismanagement of its Vermont Electric Division (VED); (3) imprudent failure to maintain accurate records to ensure that only appropriate costs were included in rates; (4) willful failure to provide service to its Vermont customers through least-cost options; and (5) persistent refusal to cooperate with regulatory investigations.

The Board cited examples of Citizens' misconduct too numerous to set forth in any detail. Suffice it to say that the Board's decision is replete with examples of inadequate and misleading accounting practices on the part of Citizens that obscured the true nature of the company's expenditures and activities. Citizens failed to implement procedures designed to promote compliance with demand-side-management (DSM) obligations, and, in some instances, claimed savings for DSM programs that appeared never to have been implemented. The company also failed to abide by its agreement to implement least-cost planning for transmission and distribution facilities, and further failed to conduct required least-cost analysis before undertaking major investments. Moreover, Citizens repeatedly failed to obtain prior Board approval, as required by statute, before engaging in significant projects, including the conversion of distribution lines to transmission lines, the relocation or modification of substations, and the construction of new lines and substations. Citizens compounded its misconduct by resisting the Department's efforts to obtain information from the company. In short, over a period of many years, Citizens engaged in a pattern of behavior aimed at thwarting the Department's and the Board's regulatory oversight.

Based on these findings, the Board concluded that Citizens' operation of VED was imprudent and failed to promote the general good of the State of Vermont. In the Board's view, Citizens' pattern of misconduct, its failure to comply with statutory law and regulatory directives, and its disdain for accepted principles of utility accounting and management justified imposition of the harshest penalty available — revocation of the utility's certificate of public good.

The Board determined, however, that immediate revocation of Citizens' franchise would not be the most effective or expedient method to achieve the ultimate goal of providing Citizens' Vermont ratepayers with the most reliable, reasonably priced energy services available. Citing the transaction costs and unintended consequences that would follow a revocation decision, and noting Citizens' professed desire to reform its operations, the Board decided against the recommendation of the Department of Public Service to revoke Citizens' franchise, and instead elected to impose a variety of other penalties aimed at ensuring that the company would follow through on its commitment to reform. The Board ordered an immediate reduction of Citizens' rates, fined Citizens $60,000 for specific statutory violations, imposed a five-year probationary period on the company, and reduced Citizens' authorized rate of return on equity 525 basis points from 10.50 percent to 5.25 percent.

The Board stated three independent grounds for its decision to cut Citizens' return on equity in half. First, the Board decided that it was appropriate to split the overall cost of equity capital evenly between the ratepayers, who will continue to benefit from Citizens' operations, and the company's investors, who are ultimately responsible for Citizens' inadequacies. Second, the Board found it just and reasonable that Citizens' shareholders receive a return roughly equivalent to the returns earned by ordinary ratepayers on passbook savings or certificates of deposit accounts. Third, the Board reasoned that Citizens' history of violations demonstrated that a very significant equity reduction in Vermont would be necessary to focus the company's attention on its management problems and to provide the necessary incentive for the company to permanently alter its unacceptable pattern of misconduct.

The Board emphasized that the return-on-equity penalty it was imposing was "just and absolutely necessary" to prevent a recurrence of the type of conduct Citizens had engaged in. The Board found it apparent that a less harsh penalty would not have the desired effect. Noting that the evidence supported revocation of Citizens' franchise, the Board made it clear that it was willing to give Citizens another opportunity to improve its performance only under circumstances that reflect the seriousness of the company's past violations. The Board ordered the return-on-equity penalty to remain in effect until Citizens demonstrated that it had corrected the problems that led to the violations, and that it was delivering energy-efficient services to its clients. Finally, the Board stressed that the 525-basis-point

reduction in return on equity would not materially affect the financial security of Citizens as a corporate entity. According to the Board, the penalty would not impact the ability of Citizens to raise the capital necessary to continue the level of service required of it in Vermont or elsewhere.

On appeal, Citizens challenges only the return-on-equity penalty, contending that the Board exceeded its authority in imposing that penalty in addition to the statutory fines, and further that the penalty is unsupported by the evidence and is so excessive that it is unconstitutionally confiscatory.

## I. The Standard of Review

We apply a deferential standard of review in appeals from the Public Service Board. *In re Green Mountain Power Corp.*, 162 Vt. 378, 380, 648 A.2d 374, 376 (1994). As long as the Board's decisions are directed at proper regulatory objectives, they "enjoy a strong presumption of validity" and "'are subject to great deference in this Court.'" *Id.* at 380, 648 A.2d at 376 (quoting *In re Green Mountain Power Corp.*, 142 Vt. 373, 380, 455 A.2d 823, 825 (1983)). We accept the Board's findings and conclusions unless the appealing party demonstrates that they are clearly erroneous, and, in reviewing those findings and conclusions, we defer to the Board's particular expertise and informed judgment. *Id.*; *In re East Georgia Cogeneration Ltd. P'ship*, 158 Vt. 525, 531-32, 614 A.2d 799, 803 (1992).

## II. The Board's Authority

Citizens first argues that the Board exceeded its authority by imposing a return-on-equity penalty for the same conduct upon which its statutory fines were based. Citizens asserts that, where the Legislature has specifically prescribed penalties for statutory violations, the Board may not increase the specified fines by imposing an additional monetary penalty in the form of a reduction in return on equity. In its reply brief, Citizens concedes that some part of the Board's return-on-equity penalty was imposed for management deficiencies not subject to specified statutory fines, and further that the Board has the authority to adjust a utility's return on equity to take into account management deficiencies; however, according to Citizens, the Board may not go beyond the limited penalty set by the Legislature for specific violations by adding a return-on-equity penalty for the same conduct.

Section 30 of Title 30 authorizes the Board to impose specified monetary fines on utilities for certain misconduct, including (1) refusing to open their books or provide lawfully required documents to the Board or the Department, (2) failing to obey a Board order, or (3) willfully hindering, obstructing or delaying the fulfillment of the duties imposed upon them by the Board. At the time that Citizens began to engage in the conduct for which it was penalized, the maximum fine under § 30 for each particular violation was $5000.* In this case, the Board cited twelve separate violations of regulatory requirements — most of which concerned Citizens' willful failure to comply with Board orders or obtain necessary permits for its activities — and imposed a $5000 fine for each of those violations.

The Board indicated that the total civil fine of $60,000 was small in light of Citizens' pattern of willful transgressions, but declined to impose specific fines for each of the many more acts identified in the proceeding that may have constituted separate statutory violations. Instead, the Board elected to impose a return-on-equity penalty based on the seriousness and the sheer number of the violations. The Board emphasized that the return-on-equity reduction related to the *pattern* of *repeated*, willful violations of permitting requirements, and the *pervasive* management failures and operational deficiencies that supported this pattern of unlawful behavior. The Board determined that the return-on-equity penalty was necessary to ensure that Citizens fulfilled its obligation to operate efficiently, provide quality service, and comply with applicable legal standards.

We conclude that the Board was not limited to the relatively meager statutory fines for individual violations in responding to Citizens' systemic mismanagement and willful defiance of the Board's authority. In rate cases, the Board has the authority, among other things, to impose new rates, to require changes in a utility's practices "relating to its service," and to make such orders "as will compel the furnishing of such adequate service as shall . . . be found by it to be just and reasonable." 30 V.S.A. § 218(a); see also *id.* § 219 ("Each company subject to supervision under this chapter shall be required to furnish reasonably adequate service . . . ."). We have described the statutory basis of the Board's regulatory authority as "extremely broad and unconfining with respect to means and methods available to that body to achieve the stated goal of adequate service at just and

---

* Section 30 of Title 30 was substantially amended in 1996. Among other things, the fines for statutory violations were increased.

reasonable rates." *Green Mountain Power Corp.*, 142 Vt. at 380, 455 A.2d at 825.

Citizens cites several out-of-state cases to bolster its argument that the Board lacked the authority to impose both statutory fines and a return-on-equity penalty for its transgressions. Only one of these cases even vaguely supports the company's "double-penalty" argument, however. See *South Central Bell Tel. Co. v. Utility Reg. Comm'n*, 637 S.W.2d 649, 653 (Ky. 1982) (citing statutory provisions that allow imposition of criminal penalties for specified violations, court concluded that "the General Assembly omitted a specific provision allowing the Commission to enforce its service cases by a reduction in a rate case"). Moreover, in each of the cases cited by Citizens, the courts took the position, based on an analysis of the particular state statutory law then in place, that the adequacy of a utility's service may not be considered in determining the utility's rate of return. See *Florida Tel. Corp. v. Carter*, 70 So. 2d 508, 510 (Fla. 1954) ("We find no authority vested in the Commission to make any orders in a rate-making proceeding with reference to inadequate service."); *Village of Apple River v. Illinois Commerce Comm'n*, 165 N.E.2d 329, 332 (Ill. 1960) ("[A]lthough the approval of proposed rate increases is necessarily related to the services offered, a rate that is otherwise just and reasonable may be a necessary condition precedent to adequate service."); *South Central Bell*, 637 S.W.2d at 652-53 ("[R]ates and service are two distinct areas and, therefore, are subject to separate procedures, standards and remedies. . . . [T]he quality of service is not germane to the normal, time-tested factors that go into the determination of a proper rate for the services rendered by a utility."); *Elyria Tel. Co. v. Public Utilities Comm'n*, 110 N.E.2d 59, 62 (Ohio 1953) ("Nowhere in the statutes can we find authority on the part of the commission to condition an increase in rates, under such circumstances, on an improvement of service.").

In this respect, these cases are directly contrary to longstanding Vermont law authorizing the Board to consider management efficiency and customer service in arriving at a determination of just and reasonable rates. See *In re Young's Community TV Corp.*, 141 Vt. 53, 57, 442 A.2d 1311, 1313 (1982) (Board acted within its discretion in reducing company's rate of return based on poor service); *Arlington Selectmen v. Arlington Water Co.*, 136 Vt. 495, 498, 394 A.2d 1130, 1131 (1978) (this Court has accepted general proposition that reasonable service is tied to statutory requirement of reasonable rates); *In re New England Tel. & Tel. Co.*, 115 Vt. 494, 513, 66 A.2d 135, 147

(1949) ("A utility must be efficiently and economically managed and operated as a condition to the exercise of its right to impose rates adequate to cover the full cost of service and thus satisfy the investor requirement."). Like Vermont, most other jurisdictions now accept the general principle that rates may be adjusted depending on the adequacy of the utility's service and the efficiency of its management. See *US West Communications, Inc. v. Washington Utilities & Transp. Comm'n*, 949 P.2d 1337, 1361 (Wash. 1997) (citing cases for proposition that regulatory agency may consider quality of service or efficiency of management in setting fair and reasonable rate of return).

In *US West*, the Washington Supreme Court examined statutory provisions comparable to those in Vermont and held that they "must be construed together to accomplish the purpose of assuring the public of adequate service at fair and reasonable rates." *Id.* at 1359; see *State ex rel. Utilities Comm'n v. General Tel. Co.*, 208 S.E.2d 681, 687 (N.C. 1974) (provisions of public utilities statute constitute single integrated plan that must be construed together to accomplish primary purpose of assuring that public is provided adequate service at reasonable charge). The court concluded that nothing in the provisions allowing the commission to impose penalties for statutory violations "indicates they are the exclusive response the Commission may make to poor service by a public service company," and further that the statutory provision pertaining to the setting of just and reasonable rates did not require the commission to resort to the penalty provisions in considering inadequate service when setting rates. *US West*, 949 P.2d at 1359; see *Gulf Power Co. v. Wilson*, 597 So. 2d 270, 273 (Fla. 1992) (rejecting utility's assertion that commission could impose only those penalties expressly authorized by statute). Rather, according to the court, statutory law allowed the commission to consider poor service when setting rates. *US West*, 949 P.2d at 1359. The same is true in Vermont.

We also find unpersuasive Citizens' related election-of-remedies argument — that the Board exceeded its authority by imposing *both* statutory fines and a return-on-equity penalty *for the same conduct*. This argument is based on only one of the three alternative grounds for the Board's decision to impose a return-on-equity penalty. That alternative ground attempted to assign basis-point reductions to the various actions or deficiencies underlying the penalty. Citizens alleges that a number of these rate-of-return penalty assignments — imposed for the company's pattern of extensive violations of permitting

requirements, for its failure to abide by an express agreement contained in a Board order, for its failure to perform a least-cost analysis prior to construction, and for its failure to deliver adequate energy-efficiency services — are based on the same conduct or deficiency for which the Board levied a specific civil fine. Analogizing to double jeopardy, but acknowledging that the question is one of legislative intent, Citizens argues that the Board cannot levy such double penalties for the same actions or deficiencies.

We do not agree with either Citizens' legal argument or the factual basis upon which it rests. Regarding the legal argument, we stress that the purpose of a rate-of-return reduction is not to penalize a company for specific acts of misconduct, but rather to set reasonable rates in cases where the consumers are not being adequately served "due to inefficiency or improvidence or other like reasons." *New England Tel. & Tel. Co.*, 115 Vt. at 513, 66 A.2d at 147. Consistent with that standard, the Board imposed its rate-of-return penalty for "a pattern of mismanagement and willful failure to abide by Vermont laws and regulations that stretches over many years." Because of Citizens' mismanagement and failure to comply with the law, the Board could not determine whether ratepayers were receiving adequate service, and at a reasonable rate, and whether there was harm to Vermont's environment. The Board specifically chose a rate-of-return penalty that would send a message to shareholders "that such corporate irresponsibility will no longer be tolerated." Thus, the Board's purpose for imposing the rate-of-return reduction was distinct from, and extended beyond, the purpose of the statutory fines to punish Citizens for individual infractions.

In view of the different purposes behind the remedies imposed by the Board, we find no support for Citizens' general argument that the statutory fines and the rate-of-return penalty cannot coexist when the factual bases for the two sanctions overlap. Public remedies are frequently cumulative as necessary to protect the public interest. See, e.g., *United States v. Forest Dale, Inc.*, 818 F. Supp. 954, 967 (N.D. Tex. 1993) (double recovery is not involved when there is civil action seeking damages and criminal action seeking imposition of fines "to deter future acts of discrimination"); *People v. Purinton*, 137 N.Y.S.2d 296, 299 (Sup. Ct. 1954) (legislature may provide concurrent remedies for enforcement of statutes by means of civil penalties and criminal prosecution); *Personal Service Ins. Co. v. Mamone*, 489 N.E.2d 785, 788 (Ohio 1986) (statutory enforcement remedies accorded to state agency "are cumulative and not mutually exclusive"). In this case,

there is no indication that the Legislature intended to preclude the Board from applying the available remedies cumulatively under appropriate circumstances.

Even if we agreed with Citizens' legal argument, it would not support striking either the rate-of-return reduction or the civil fines in this case. As the Board stressed in its reconsideration decision, the rate-of-return penalty was for "pervasive management and operational deficiencies of the Company," not specific acts of misconduct. Thus, even if, as Citizens does, we look solely at the Board's itemization of component parts of the rate-of-return penalty — which, as noted, was only one of three alternative rationales provided for the penalty level chosen — we believe that the Board has adequately distinguished the conduct for which the rate-of-return penalty was imposed from the conduct underlying the fines. For example, with respect to the company's failure to abide by permit requirements, the Board stated that "the return on equity reduction ordered here relates to the company's pattern of repeated, willful violations of permitting requirements, the management failures that support this pattern, and the continuing failure to train and supervise Vermont operational personnel." This conclusion is supported by the fact that the Board did not attempt to levy fines for each violation of § 30, leaving many violations shown by the evidence to be lumped into its finding of a pattern of improper conduct.

### III. The Sufficiency of the Evidence

Next, Citizens argues that, even if the Board has the statutory authority to impose a rate-of-return penalty when a separate penalty exists under the statute, the Board's 525-basis-point return-on-equity penalty was not supported by sufficient evidence. In Citizens' view, the Board failed to make findings to support its return-on-equity penalty, and the evidence in the record did not support the penalty because no party ever proposed the basis-point reduction in return on equity ultimately arrived at by the Board. We find no merit to either assertion.

At the hearing, the Department recommended revocation of Citizens' franchise and a combination of penalties that would act as a strong deterrent to future mismanagement. The Department's expert identified over one dozen separate and distinct acts of misdeeds, imprudence, and mismanagement on the part of Citizens that warranted the imposition of penalties in the form of a reduction in return

on equity. The expert testified that several of the violations involved aggravating circumstances because of their pervasive or willful nature, or because they constituted a serious breach of public trust. Noting that 100-basis-point reductions in return on equity had commonly been imposed for individual or related imprudent acts, the expert testified that *concurrent* return-on-equity penalties were *not* appropriate in this case, given the seriousness, the pervasiveness, the number, and the variety of the misdeeds. While ultimately recommending a 300-basis-point reduction in return on equity, the expert testified that each of the three most serious violations warranted separate 100-basis-point reductions, and that the other violations warranted no less than 75-basis-point reductions.

Citizens did not dispute this testimony, but rather its expert took the position that a 300-basis-point reduction in return on equity would be confiscatory. The expert conceded that it was standard policy to impose a return-on-equity penalty on a utility that had gone astray, and further opined that the Board could impose penalties that would be painful but still allow the company to survive. The expert concluded, however, that the return-on-equity penalty proposed by the Department was excessive. When asked why, the expert testified only that electric utilities were currently being allowed levels of equity returns at and sometimes above eleven percent, and that the penalty proposed by the Department would limit Citizens' return on equity to below seven and one-half percent.

The Board concluded that a substantial reduction in Citizens' allowed return on equity was required because of the pervasiveness and seriousness of the numerous violations, which could have negative consequences for the ratepayers and the environment. The Board recognized that a 525-basis-point reduction was large in comparison to penalties that it had adopted in other proceedings, but it noted that the violations in the other proceedings paled in comparison to the widespread and longstanding violations found in this case. As discussed above, the Board then itemized three independent grounds for its decision to cut Citizens' return on equity in half and concluded this penalty was "just and absolutely necessary" to prevent a recurrence of the type of conduct Citizens had engaged in.

We agree with the Board's statement in its reconsideration order that the remedy it imposed lies well within the range of outcomes supported by competent testimony presented at the hearing. The Department may have recommended an overall 300-basis-point reduction in return on equity, but the testimony of its expert supported

the Board's imposition of even a higher return-on-equity penalty than the one ultimately arrived at by the Board. See *In re Green Mountain Power Corp.*, 131 Vt. 284, 305, 305 A.2d 571, 584 (1973) (Board's weighing of evidence will be sustained as long as there is evidence to support it); see also *In re Twenty-Four Vermont Utilities*, 159 Vt. 339, 348, 618 A.2d 1295, 1300-01 (1992) (rate of return is not subject to precise measurement and therefore calls for Board's expert judgment); *In re Central Vermont Public Serv. Corp.*, 141 Vt. 284, 288, 449 A.2d 904, 906-07 (1982) (complexities of utility regulation place added premium upon Board's expertise in ratemaking; Board's determination of just and reasonable rates is plainly within this sphere of broad judicial deference). The Board's detailed and unchallenged explanation of why it was imposing the 525-basis-point penalty is sufficient to support its decision. See J. Bonbright, A. Danielsen & D. Kamerschen, Principles of Public Utility Rates 205 (2d ed. 1988) (fair rate of return is one that enables utility to attract capital but that discourages inefficient management); cf. *Mountain Fuel Supply Co. v. Public Serv. Comm'n*, 861 P.2d 414, 428 (Utah 1993) (although it may be difficult to articulate why a particular decrease in rate of return is more appropriate than another as method to prompt utility to correct mismanagement or inefficiency, commission must provide some rationale for its choice).

We specifically reject Citizens' argument that the Board is limited to imposing a penalty that was supported by some expert witness. Citizens argues this point from our precedents requiring that Board orders be supported by findings, which are in turn supported by evidence. See *In re Burlington Elec. Light Dep't*, 149 Vt. 300, 303-04, 542 A.2d 294, 296 (1988). We can think of few responsibilities of the Board involving greater discretion than the setting of a rate-of-return penalty. The evidence must establish the grounds for such a penalty, but ultimately the amount must be based on the seriousness and nature of the grounds, and what action is necessary to prevent reoccurrence. As long as the Board's decision shows a thorough and fair evaluation of the various relevant factors — as it does in this case — it will be upheld. The Board's discretion is not limited to selecting from recommendations made or supported by the parties.

We also reject Citizens' argument that it was not given fair notice of, and thus an opportunity to respond to, the possible magnitude of the rate-of-return penalty. Once the Department sought such a penalty, Citizens knew that this remedy was in issue and had the opportunity to respond to the Department's recommendation and to

propose an alternative amount. In fact, Citizens did both in this case. Citizens was not entitled to an advance decision by the Board — a decision that had to be based on a careful evaluation of all of the evidence — in order to know what evidence to present to affect that decision.

### IV. The Constitutionality of the Return-on-Equity Penalty

Lastly, Citizens argues that the return on equity and overall rate of return set by the Board is confiscatory and therefore unconstitutional. In the first part of this argument, Citizens contends that the Board was obligated, but failed, to evaluate the impact that its equity-reduction penalty would have on the ability of Vermont Electric Division (VED), as opposed to the company as a whole, to maintain its financial integrity, attract capital, and compensate investors for risks assumed. This argument fails for at least two reasons.

First, the argument is, for the most part, inconsistent with the position Citizens took in the proceedings before the Board. Citizens neither introduced evidence to support any rate-of-return analysis of VED as a stand-alone entity, nor even suggested that such an analysis was required until after the Board rendered its decision. In contending that the return-on-equity penalty urged by the Department was confiscatory, Citizens' expert asked the Board to consider the capital structure of Citizens, not VED. In his testimony, the expert consistently referred to "the Company" and failed to make any distinction between VED and the company as a whole. Further, in its proposal for a decision, Citizens stated that "confiscatory rates are those that would impinge on *Citizens'* ability to raise capital." (Emphasis added.)

As noted, in its initial decision, the Board determined that its return-on-equity penalty would not materially impact the financial security of Citizens as a corporate entity. Citizens briefly "suggested" in its motion for reconsideration, without elaboration or citation to legal authority, that it is impermissible for the Board to set rates for VED based on the fact that a large penalty was necessary to focus Citizens' attention on VED's problems. Citizens offered no evidence or allegations regarding the actual impact of the penalty on VED, nor did the company request a hearing on that issue. The Board responded by noting that Citizens failed to explain why it was inappropriate to consider the financial impact on the company as a whole, and by concluding that the return-on-equity penalty would not imperil VED's ability to attract capital. Indeed, the Board surmised that the substantial penalty would compel Citizens to address VED's

management problems and thereby enhance VED's ability to attract resources from within the company. Based on these facts, we conclude that Citizens effectively waived its argument that the Board erred by considering the financial impact on the company as a whole rather than on VED as a stand-alone entity. See *Twenty-Four Vt. Utilities*, 159 Vt. at 352-53, 618 A.2d at 1303.

Second, even assuming that the argument was adequately raised and briefed before the Board, we find it lacking in merit on this very sparse record. In this case, the Board expressed doubt about Citizens' suggestion that, in certain respects, VED operated as a stand-alone entity. After all, Citizens, not VED, is the entity that attracts outside capital and compensates investors. As the Board indicated in its reconsideration order, VED attracts capital only in the intracorporate arena, and thus the return-on-equity penalty should encourage the company to direct more resources to VED. Further, the Board found that the numerous transgressions identified in this proceeding resulted from mismanagement both in Vermont and in out-of-state headquarters, and that Citizens' officers and its corporate structure were responsible for the pattern of misbehavior that prompted the Board's imposition of substantial penalties.

The only case cited by Citizens in support of its argument that the Board should not have considered the financial impact of its rates on the company as a whole is an 1898 United States Supreme Court case that did not concern a rate-of-return penalty arising from a utility's imprudence or mismanagement. See *Smyth v. Ames*, 169 U.S. 466, 541 (1898) ("The State cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the State has no control."). As discussed above, modern courts and commentators generally agree that regulatory agencies may impose rates that punish managerial inefficiency and provide an incentive for improvement. See, e.g., *Mountain Fuel Supply*, 861 P.2d at 427 (regulatory commission may reduce rate of return as method to prompt utility to correct mismanagement and inefficiency without offending standard established by Supreme Court); Bonbright, et al., *supra*, at 205 (in determining fair rate of return, regulatory commissions may consider effect rates will have not only on allowing public utility to secure capital to provide service but also on stimulating managerial efficiency). Here, the Board found that its return-on-equity penalty was absolutely necessary to focus the company's attention on its operational deficiencies and to prevent a recurrence of past problems.

■ In the second part of its constitutional argument, Citizens contends that the Board violated the standard set forth in Supreme Court cases by imposing a return on equity below any range of reasonableness. We conclude that Citizens has failed to meet its burden of demonstrating that the rates imposed by the Board are so low as to be confiscatory and thus unconstitutional.

The fundamental considerations in determining just and reasonable rates were set forth by the United States Supreme Court nearly eighty years ago:

> A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, *under efficient and economical management*, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.

*Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n,* 262 U.S. 679, 692-93 (1923) (emphasis added); see *In re Village of Hardwick Elec. Dep't,* 143 Vt. 437, 442, 466 A.2d 1180, 1182 (1983) (quoting and following *Bluefield* standard).

*Bluefield,* however, did not concern a review of rates reduced for imprudence or mismanagement. Commentators and courts have acknowledged since *Bluefield* that a utility is not entitled to the same rate of return irrespective of the efficiency of the utility's management or the adequacy of its service. See R. Pierce & E. Gellhorn, Regulated Industries 134-35 (3d ed. 1994) ("The phrase 'under efficient and economical management' [in *Bluefield*] is an important qualification. If an agency finds that a firm is not being managed efficiently and economically, it can lower the firm's allowed rate of return below the level otherwise required to meet the comparable risk test."); C. Philips, The Regulation of Public Utilities 553 (1993) ("there is no such thing as a reasonable rate for service that is deficient"); see also *D.C. Transit Sys., Inc. v. Washington Metro.*

*Area Transit Comm'n*, 466 F.2d 394, 420-21 (D.C. Cir. 1972) (*Bluefield* addressed adequacy of return "'under efficient and economical management'") (citing *Bluefield*, 262 U.S. at 693); *Arlington Selectmen*, 136 Vt. at 498, 394 A.2d at 1131 ("we have accepted [the] general proposition . . . that poor service can justify lower rates"); *New England Tel. & Tel. Co.*, 115 Vt. at 513, 66 A.2d at 147 ("A utility must be efficiently and economically managed and operated as a condition to the exercise of its right to impose rates adequate to cover the full cost of service and thus satisfy the investor requirement."); *In re General Tel. Co.*, 652 P.2d 1200, 1209 (N.M. 1982) (regulatory commission may consider in rate proceeding quality or inadequacy of service in determining what is just and reasonable rate of return to utility); *National Utilities, Inc. v. Pennsylvania Pub. Util. Comm'n*, 709 A.2d 972, 979 (Pa. Commw. Ct. 1998) (Fifth and Fourteenth Amendments are not violated when public utility is denied rate increase for failing to provide adequate service to public, even if result is rate of return less than utility would otherwise be entitled to receive).

In arriving at a determination of just and reasonable rates, the regulatory agency is required to balance both investor *and* consumer interests. See *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944); *Village of Hardwick Elec. Dep't*, 143 Vt. at 443, 466 A.2d at 1183; *In re Public Serv. Co. of N.H.*, 539 A.2d 263, 268 (N.H. 1988) (constitution requires only that regulatory body engage in rational process of balancing consumer and investor interests). Of course, "a fair return to investors is not necessarily fair to consumers." *New England Tel. & Tel. Co.*, 115 Vt. at 513, 66 A.2d at 147; see *Federal Power Comm'n v. Natural Gas Pipeline Co.*, 315 U.S. 575, 607 (1942) (Black, Douglas and Murphy, JJ., concurring) ("The consumer interest cannot be disregarded in determining what is a 'just and reasonable' rate. Conceivably, a return to the company of the cost of the service might not be 'just and reasonable' to the public."); *Pennsylvania Elec. Co. v. Pennsylvania Pub. Util. Comm'n*, 502 A.2d 130, 134 (Pa. 1985) (legitimate areas of concern noted in *Hope* are appropriate factors to be weighed in balancing consumer and investor interests, but are not, in themselves, controlling); *El Paso Elec. Co. v. Public Util. Comm'n*, 917 S.W.2d 846, 862 (Tex. Ct. App. 1995) (end result of balance of consumer and investor interests does not insure that utility will produce net revenues).

Ratemaking necessarily encompasses an evaluation of the "efficiency of the public utility's operations, the adequacy of its service, and

the competency of its management." *In re Valley Road Sewerage Co.*, 666 A.2d 992, 996 (N.J. Super. Ct. App. Div. 1995). Each of these factors must be considered when determining whether rates are just and reasonable under constitutional and statutory standards. See *id.* at 995-96. Hence, "rate levels are not offensive to constitutional and statutory standards merely because they fix returns at a lower scale for inefficient operators." *Id.* at 995; see *D.C. Transit Sys., Inc.*, 466 F.2d at 419 (utility's fulfillment of its service commitments is sine qua non to constitutional protection under confiscation principles; inefficiency and inferior service deserve less return than would normally be forthcoming).

Accordingly, we reject Citizens' suggestion that it is entitled to a certain level of return no matter how egregious its mismanagement or inadequate its service. See *Valley Road Sewerage*, 666 A.2d at 996. If we were to accept this notion, it would, in effect, permit Citizens to disregard its public obligations and yet insist upon rates that guarantee its continued financial integrity. See *D.C. Transit Sys., Inc.*, 466 F.2d at 422. As demonstrated by the case law cited above, the constitution does not compel such a result. See *id.* at 423 (constitution neither guarantees public utility immunity from loss occasioned by mismanagement, nor bars regulatory agency from taking adequate steps to protect public from such mismanagement, even if short-term effect is temporary loss to utility); *State ex rel. Utilities Comm'n*, 208 S.E.2d at 687 (commission is not required to fix rates without regard to quality of service, thereby guaranteeing "fair" rate of return to "complacent monopoly" that persists in rendering mediocre service and defying commission orders).

On appeal, Citizens has the "heavy burden" of demonstrating that the rates imposed by the Board are unjust and unreasonable. *Hope*, 320 U.S. at 602; see *Jersey Cent. Power & Light Co. v. F.E.R.C.*, 810 F.2d 1168, 1175-76 (D.C. Cir. 1987) (under deferential standard established in *Hope*, "the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped"). Our role in reviewing Board orders is not to reweigh the Board's balancing of consumer and investor interests in setting rates, but rather to assure ourselves that the Board has given reasoned consideration to both of those interests, and to consider whether, given those interests, the end result of the rate order is within a "zone of reasonableness." *Permian Basin Area Rate Cases*, 390 U.S. 747, 791-92 (1968); *Hope*, 320 U.S. at 603; see *Jersey Cent.*, 810 F.2d at 1191-92 (Starr, J., concurring) (constitution requires only that end

result reflect reasonable balancing of interests of investors and ratepayers).

Barring a showing that, given all of the circumstances, the Board's order results in unjust rates, we defer to the Board's decision because it "calls for a highly expert judgment" that requires the balancing of considerations that "cannot be cast into a legalistic formula" and thus are better left entrusted to the regulatory agency. *Natural Gas Pipeline Co.*, 315 U.S. at 607 (Black, Douglas and Murphy, JJ., concurring); see Bonbright, et al., *supra*, at 317 (it is generally accepted that commissions may apply their own judgment under deferential test established in *Hope* and its progeny). "'If the total effect of the rate order cannot be said to be unreasonable, judicial inquiry . . . is at an end.'" *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 310 (1989) (quoting *Hope*, 320 U.S. at 602).

We stress that other than claiming broadly that the rate-of-return reduction is confiscatory and therefore unconstitutional, Citizens has made virtually no record to support its argument. Thus, it has failed to recognize, let alone satisfy, its heavy burden. Cf. *US West*, 949 P.2d at 1359 (utility made no showing that commission's rate decision fell outside zone of reasonableness). Its only support for the argument that the Board's return-on-equity penalty results in unjust and unreasonable rates is: (1) the reduced return on equity imposed by the Board limited the company, at least temporarily, to the same return obtained by holders of passbook savings and certificate-of-deposit accounts, one of the alternative justifications cited by the Board; (2) the penalties imposed in this case are more severe than those imposed in a number of out-of-state decisions involving completely different facts; and (3) an affidavit, submitted to the Board as part of the company's motion for reconsideration, in which a company accountant states that the Board's return-on-equity penalty will result in reduced revenues of approximately $1.5 million annually. Neither the citations to distinguishable case law, nor the single statement in the affidavit, nor the bald assertion that it was plainly inappropriate for the Board to restrict its rate of return to the return generated by passbook savings accounts — either considered separately or together — come close to satisfying the standard under which we may overturn rate decisions.

In justifying its failure to make a record to support its argument, Citizens returns to its claim, rejected above, that it was denied proper notice that such a heavy penalty was contemplated by the Board. Even if we were to accept that claim, however, it would not explain

Citizens' failure to proffer any evidence before the Board, in connection with its motion for reconsideration, to show the effect of the rate-of-return order on the company or its Vermont Electric Division. Cf. *Twenty-Four Vermont Utilities*, 159 Vt. at 352, 618 A.2d. at 1303 (utility waived issue by failing to raise it before Board and include it in post-judgment motion). Nor would it explain Citizens' failure to seek an additional hearing to put on additional evidence concerning that effect of the rate order. In short, Citizens has utterly failed to meet its heavy burden of demonstrating that the Board's rate decision is so plainly unreasonable as to be confiscatory and therefore unconstitutional.

*The decisions of the Public Service Board dated June 16, 1997 and August 28, 1997 are affirmed.*