NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 44

No. 2017-194

| | |
|---|---|
| In re Investigation into Petition of Vermont Gas Systems, Inc. (AARP, Appellant) | Supreme Court |
| | On Appeal from Public Utility Commission |
| | December Term, 2017 |

James Volz, Chair

James A. Dumont of Law Office of James A. Dumont, P.C., Bristol, for Appellant.

Stephanie B. Hoffman and Geoffrey Commons, Department of Public Service, Montpelier, for Appellee Vermont Public Service Department.

Craig S. Nolan and Owen J. McClain of Sheehey Furlong & Behm P.C., Burlington, for Appellee Vermont Gas Systems, Inc.


PRESENT: Skoglund, Robinson, Eaton and Carroll, JJ., and Teachout, Supr. J., Specially Assigned


¶ 1. **CARROLL, J.** In this ratemaking proceeding, AARP[1] appeals an order of the Vermont Public Utility Commission[2] that incorporates a memorandum of understanding (MOU) reached by the Department of Public Service and Vermont Gas Systems, Inc. (VGS). Among other things, the incorporated MOU sets VGS's firm non-gas rates for the tax year beginning October 1, 2016; allows VGS to use a specified amount from a fund previously authorized by the

---

[1] AARP was formerly known as the American Association of Retired Persons.

[2] Effective July 1, 2017, the Public Service Board was renamed as the Public Utility Commission. 2017, No. 53, §§ 9-13. For the sake of clarity, we refer to the body as the Commission throughout the opinion, even when discussing dockets or activities that occurred before the name change.

Commission to mitigate the rate effects of any system expansion; and establishes both the penalty for VGS's imprudent costs associated with the Addison Natural Gas Project (ANGP) and its return on equity. We reverse and remand the matter for the Commission to make further findings regarding VGS's ANGP-related imprudent costs and, if necessary, to reconsider the penalty imposed for those costs under the incorporated MOU.

## I. Procedural History

¶ 2.    To put the issues raised in this appeal in context, we discuss briefly at the outset previous Commission orders and then examine those orders in greater detail as needed in addressing each issue. From 2006 to 2016, VGS operated under an "alternative regulation" plan (ARP). See 30 V.S.A. § 218d(a) (authorizing Commission to approve alternative forms of regulation for electric and gas companies as long as Commission makes specified findings). Pursuant to the ARP, VGS's rates were automatically adjusted every quarter based on changes in gas costs.

¶ 3.    In 2011, VGS proposed amending its ARP by establishing the System Expansion and Reliability Fund (SERF) as a means of facilitating the expansion of its service into Addison County, and perhaps beyond, while maintaining a smooth rate trajectory. At the time of the proposal, VGS would have been required under the ARP's automatic rate adjustments to reduce customer rates for the spring 2011 quarter by approximately $4.4 million, which would have been the ninth rate reduction in the previous ten quarters. Instead of reducing rates for existing customers pursuant to the provisions of the ARP, VGS proposed depositing that amount annually into SERF to smooth out rate increases resulting from future expansion of services. Under the proposal, VGS's rates would remain the same rather than be reduced by an automatic adjustment.

¶ 4.    VGS and the Department reached an MOU on the proposal, which was accepted by the Commission in a September 2011 order. The Commission concluded that SERF would provide a creative mechanism to facilitate the expansion of natural gas service in Vermont, which had long been a goal of Vermont energy policy. In effect, as the Commission explained, the SERF would

allow VGS to collect from ratepayers money for later use to offset future rate increases that might arise from the projected system expansion.

¶ 5. The Commission emphasized that, in authorizing SERF, it was not deciding at that time how or even whether the fund might be used. As safeguards for establishing SERF, the Commission, among other things: (1) prohibited VGS from making any distributions from the fund until such time as the Commission authorized them, (2) required VGS to make quarterly reports on both the fund and the company's expansion plans, and (3) required VGS to track all customer payments so that funds could be returned to customers in the event the proposed expansion of the system did not occur.

¶ 6. The Commission recognized the concerns about having current ratepayers pay higher rates for potential future benefits, but concluded that the potential benefits—expanded service, an incentive for increased economic development, and reduced greenhouse gas emissions—outweighed these concerns. The Commission further recognized its dissenting member's concerns about the establishment of SERF and the potential for subsidization of future customers by existing ones, but it concluded that the concerns about the fund were misplaced in light of the conditions imposed on VGS, including that money in the fund be returned to customers should expansion not occur. Any use of SERF funds would have to be specifically authorized by the Board in future proceedings. The question of whether unjust cross-subsidization existed would be considered as part of a review of any expansion project once it was filed.

¶ 7. In December 2013, the Commission issued a CPG for VGS to build a forty-one-mile, twelve-inch-diameter natural gas pipeline to Addison County. See 30 V.S.A. § 248 (setting forth procedures and criteria for obtaining CPG to construct or purchase electric or gas facilities). In its order, the Commission explicitly rejected the argument that the ANGP would result in an impermissible cross-subsidy of new customers in Addison County by existing customers in Chittenden and Franklin counties. The Commission acknowledged that, in the short term, existing customers would effectively be subsidizing new customers and that in this case the point at which

3

the annual revenues from the project were expected to exceed the annual carrying costs was further in the future than that previously accepted by the Commission. Nonetheless, the Commission concluded that there was no impermissible cross-subsidization because existing customers would derive not only some short-term benefits but also substantial long-term benefits from a project expected to provide service for several decades.

¶ 8. Following the December 2013 order, VGS's estimated costs increased first from $86 million to $121 million and then later to $153 million.[3] In two separate proceedings pursuant to Vermont Rule of Civil Procedure 60(b),[4] in which AARP participated as an intervenor, the Commission declined to reopen the record to reconsider its December 23 order in light of the increased estimated costs for the ANGP. In the first of those orders, issued in October 2014, the Commission concluded that the estimated cost increase was not of such a material and controlling nature to change its previous determination that the ANGP would promote the public good under the criteria set forth in § 248. The Commission addressed AARP's argument that the new estimated cost of the ANGP would result in an impermissible cross-subsidy. The Commission acknowledged that the cost increase would extend the period during which existing customers would pay higher rates than if the ANGP were not constructed, but it concluded that the new estimated project costs would still not result in an impermissible cross-subsidy over the expected life of the project.

¶ 9. The Commission also declined to reopen the CPG proceeding in its second Rule 60(b) order issued in January 2016. In so ruling, the Commission once again rejected AARP's argument that the new estimated costs resulted in an impermissible cross-subsidy. The Commission cited as a significant factor in its decision an MOU in which VGS agreed not to seek rate recovery costs in excess of $134 million, even if actual costs exceeded that figure. The

---

[3] As of September 2016, ANGP-related costs were forecasted to reach $165 million.

[4] Vermont Rule of Civil Procedure 60(b) applies to proceedings before the Commission pursuant to the Commission's rules.

4

Commission reiterated its finding that, over the life of the ANGP, new customers would provide sufficient contributions to fixed costs such that the cross-subsidy resulting from the project would be acceptable. Neither AARP nor any party appealed either of the Commission's Rule 60(b) orders.

¶ 10. The instant proceeding before the Commission commenced on February 17, 2016, when VGS filed for an overall rate decrease of 3.3% effective October 1, 2016. The proposal included a request for a 2% increase in non-gas costs, which would be offset by a larger decrease in gas costs. The proposed rate reflected inclusion of costs associated with the ANGP and the use of $13.9 million in SERF funds. The Commission opened an investigation into the proposed rate change and granted permissive intervention to AARP, as well as the Conservation Law Foundation. Between June and December 2016, the Commission held a public hearing over several days, the parties submitted voluminous prefiled testimony and supporting exhibits, and the Commission held technical hearings at which the prefiled testimony and exhibits were admitted into evidence.

¶ 11. On February 2, 2017, VGS and the Department filed the MOU that the Commission ultimately incorporated into its order. AARP filed an objection to the MOU and requested an evidentiary hearing on the matter. On March 13, 2017, after AARP and VGS engaged in discovery, the Commission held a continued technical hearing for the limited purpose of addressing the terms and conditions of the MOU. Following the hearing, the Department, VGS, and AARP filed briefs.

¶ 12. On April 14, 2017, the Commission filed an order in which it determined that VGS's existing non-gas rates would remain unchanged. The Commission stated that its decision was based on the record evidence and the MOU arrived at by VGS and the Department. Under the MOU, VGS and the Department agreed to maintain current non-gas rates and to use $5.55 million of SERF previously authorized by the Commission to mitigate the rate effects of any system expansion. Noting that the parties in the proceeding had focused primarily on whether the

5

costs for the ANGP were prudently incurred, the Commission stated that, as VGS acknowledged in the MOU, the company incurred imprudent costs by failing to remedy management problems in the early stages of the project. The Commission concluded that, combined with VGS's earlier agreement to limit its rate recovery costs to $134 million, which resulted in a disallowance of approximately $31 million, limiting VGS's return-on-equity (ROE)[5] to 8.5%—less than VGS requested and the Department proposed—for a three-year period was an appropriate penalty for the imprudent costs incurred by VGS.

The Commission also concluded, among other things, that: (1) no evidence was presented to suggest that the costs associated with a twelve-inch-diameter pipeline, as opposed to a ten-inch-diameter pipeline, should be excluded from the rate base as not used and useful in the rate year; and (2) for the reasons stated in its prior orders, the ANGP would not result in an impermissible cross-subsidy, and the proposed SERF withdrawal was a reasonable measure to smooth rates as the ANGP-related costs begin to be collected from ratepayers. Accordingly, the Commission: (1) accepted the MOU and incorporated it into its order; (2) authorized VGS to withdraw $5.5 million from SERF to apply to base rates for fiscal year 2017; and (3) authorized VGS to earn a ROE of 8.5% for a period of three years through September 2019.

## II. Issues

¶ 13. AARP appeals the order, arguing that the Commission erred by: (1) failing to make specific findings indicating the amount of imprudently incurred costs; (2) failing to explain how the allowed ROE would provide a financial benefit to ratepayers and thus be an appropriate penalty for imprudent costs; (3) finding that no party presented testimony on the appropriate size for the ANGP pipeline, which was the basis for the Commission rejecting AARP's argument that the twelve-inch pipeline did not meet the "used and useful" standard; and (4) concluding, with respect

---

[5] The ROE is essentially the profit a utility is allowed to earn. It is a combination of the cost of paying back debt holders with interest and the return utilities provide to their equity shareholders. A utility's ROE is the only portion of the revenue requirement that the utility keeps as profit.

6

to the ANGP-related costs, that it had the authority to impose on existing ratepayers a substantial subsidy favoring new ratepayers.

## A. Standard of Review

¶ 14.    Generally, this Court applies "a deferential standard of review in appeals from" Commission orders. In re Citizens Utilities Co., 171 Vt. 447, 450, 769 A.2d 19, 23 (2000). "As long as the [Commission's] decisions are directed at proper regulatory objectives, they enjoy a strong presumption of validity and are subject to great deference in this Court." Id. (quotation omitted). This is particularly true with respect to the Commission's ratemaking decisions, which are at the core of the Commission's regulatory expertise. See In re Tariff Filing of Cent. Vt. Pub. Serv. Corp., 167 Vt. 626, 626, 711 A.2d 1158, 1159 (1998) (mem.) ("Decisions regarding rate-making in particular are subject to great deference in this Court so long as it can be shown they are directed at proper regulatory objectives." (quotation omitted)); In re Cent. Vt. Pub. Serv. Corp., 141 Vt. 284, 288, 449 A.2d 904, 907 (1982) (recognizing Commission's expertise and Court's limited role in ratemaking decisions). The Commission's findings will stand unless clearly erroneous; our role in reviewing the Commission's findings and conclusions is neither to reweigh conflicting evidence nor reassess the credibility of witnesses. Tariff Filing of Cent. Vt. Pub. Serv. Corp., 167 Vt. at 626-27, 711 A.2d at 1159-60.

## B. Imprudent ANGP-Related Costs

¶ 15.    AARP first argues that the Commission committed reversible error by failing to make specific findings detailing the amount of imprudently incurred ANGP-related costs. According to AARP, this error not only leaves this Court to speculate as to what was decided and how, but also violates the Commission's duty to respond to each of AARP's proposed findings on imprudently incurred costs. We disagree.

¶ 16.    The Commission is charged with setting rates that are just and reasonable. See 30 V.S.A. §§ 218(a), 225(b). In arriving at just and reasonable rates, the Commission is authorized to consider a utility's management efficiency and customer service. Citizens Utilities Co., 171 Vt.

7

at 452, 461-62, 769 A.2d at 25, 31-32. In this case, once the Department submitted evidence challenging the prudence of VGS's management in incurring ANGP-related costs, VGS was required to demonstrate that the costs to be passed on to ratepayers were prudently incurred. See In re Tariff Filing of Cent. Vt. Pub. Serv. Corp., 172 Vt. 14, 27 n.5, 769 A.2d 668, 678 n.5 (2001) (stating that once prudence of incurred costs is actually litigated, rebuttable presumption that costs were prudently incurred vanishes and utility retains burden of establishing prudence).

¶ 17.   Here, the Department and VGS submitted substantial testimony on the extent to which VGS's ANGP-related costs were imprudently incurred. In his prefiled testimony, the Department's expert devoted extensive responses to questions concerning which costs should be excluded as imprudently incurred. According to the expert, prudence should be measured by requiring VGS to provide a satisfactory explanation for exceeding its $86.6-million cost estimate of the project in the CPG proceeding. The expert pointed to company mismanagement during the early phases of the project, as exemplified by VGS not being prepared to undertake a construction project of that size, failing to secure the necessary rights of way, failing to enter into contracts with contractors before work began, and then needing to change contractors because of the poor performance and cost overruns of the first contractor.

¶ 18.   The Department's expert did credit VGS for hiring an outside firm to do a risk assessment of the project that was completed in February 2014. The expert also acknowledged that calculating disallowances based on imprudence "is inherently an inexact science because often, you cannot trace precise costs to an imprudent decision" and "even where you can, some benefit may have been provided as a result of costs that were, in part, attributable to management imprudence."

¶ 19.   With this in mind, the expert first identified discrete areas of imprudence that were relatively easy to recognize and then considered a global recommended disallowance based on the overall planning and management of the ANGP. Toward that end, the expert provided a detailed explanation for disallowing litigation costs, excess internal costs, unnecessary construction costs

8

in the early stages of the project, costs associated with management change, and costs incurred by the delay in obtaining the necessary rights of way. The expert estimated these discrete costs to total approximately $25 million in disallowances.

¶ 20. The expert then added to that sum $10 million as a global adjustment, for a total recommended disallowance of $35 million. In adding the global adjustment to the discrete costs, the expert relied primarily on the February 2014 risk assessment that VGS obtained. In addition to VGS's lack of expert advice and independent oversight in the early stages of the project, the expert focused on VGS's ultimate failure to implement Phase II of the ANGP, which would have extended gas services to International Paper in Ticonderoga, New York. The expert acknowledged that VGS should not be faulted for pursuing the International Paper agreement, but, at the same time, he relied on VGS's agreement with International Paper "as providing a proxy to measure [VGS's] overall imprudence" with respect to the ANGP. According to the expert, the $10 million that International Paper was to pay VGS toward Phase I upgrades "provide[ed] an appropriate measuring stick to measure [VGS's] overall imprudence."

¶ 21. In response, VGS's vice-president of regulatory affairs not only challenged each of the discrete costs recommended by the Department's expert, but also asserted that there was "no basis" for the recommended $10 million global disallowance, which would constitute 75% of the spending on the project prior to April 2014. The witness first pointed out that its February 2014 risk assessment had corrected mismanagement problems in the early stages of the ANGP, as the Department's expert acknowledged, and that the Department had failed to identify any evidence of how the early mismanagement problems had had an impact on costs incurred later in the project. The witness further challenged the notion that VGS should be penalized for International Paper's terminating Phase II of the contract, pointing out that everyone recognized it was reasonable to pursue an agreement with International Paper and that the Commission explicitly approved the ANGP as a stand-alone project without consideration of any potential contributions from International Paper. The witness expressed her strong disagreement with a vague global

disallowance based in large part on a hindsight review of a separate project. VGS also provided testimony asserting that all of its costs associated with the ANGP, apart from costs associated with some early mismanagement, were prudently incurred and were in line with similarly scaled projects in other states and that these prudently incurred costs greatly exceeded the $134 million cap. AARP did not present any evidence challenging the amount of prudent costs.

¶ 22. In its decision, the Commission recognized VGS's acknowledged imprudence in planning and managing the ANGP during the early stages of the project. The Commission found that "[a]lthough VGS did eventually make leadership changes and improve its project oversight systems, the Company had opportunities to remedy these management concerns earlier in the Project's timeline and should have done so." The Commission concluded that although the record could support "some specific cost disallowances" based on VGS's acknowledged imprudence in planning and managing the early stages of the ANGP, "the record in this proceeding and the findings above would not support a reduction greater than the $31 million effective disallowance that VGS has already agreed to through the $134 million cap."

¶ 23. AARP does not challenge the sufficiency of the evidence to support this conclusion. Rather, AARP argues that the Commission's lack of findings specifying the types and amounts of imprudent costs leaves this Court without an adequate basis to review the Commission's decision to allow VGS to pass on to ratepayers $134 million in ANGP-related costs. See In re MVP Health Ins. Co., 2016 VT 111, ¶ 20, 203 Vt. 274, 155 A.3d 1207 (stating that adequate findings are necessary to determine whether administrative agency exercised sound discretion implicitly mandated by statute); New England Power Co. v. Town of Barnet, 134 Vt. 498, 503, 367 A.2d 1363, 1366 (1976) ("The purpose of findings is to make a clear statement to the parties, and to this Court, if appeal is taken, of what was decided and how the decision was reached." (quotation omitted)).

¶ 24. We conclude that the Commission's findings on imprudent costs fall short of the minimum necessary for effective review by this Court. To be sure, as the parties agree, it is often

10

virtually impossible to precisely calculate imprudent costs. By no means is the Commission obligated to provide an itemized statement of imprudent costs to be disallowed. But here the Commission merely stated that the amount of imprudent costs did not exceed the effective $31 million in disallowed costs agreed to under the MOU. There are no findings that allow this Court to understand how the Commission arrived at this conclusion. It is unclear whether the Commission rejected all or part of the global disallowance advocated by the Department's expert before the MOU was reached or whether it accepted the global disallowance but rejected some of the discrete costs that the Department's expert urged the Commission to disallow. We are also unable to discern whether the Commission's acceptance of the MOU capping VGS's ROE at 8.5% for three years impacted the Commission's determination of imprudent costs. The Commission's brief conclusion regarding imprudent costs leaves us unable to answer these questions or determine how the Commission arrived at its decision. Accordingly, the matter must be remanded for further factfinding on imprudent costs.[6] Cf. In re Cont'l Tel. Co. of Vt., 150 Vt. 76, 77, 549 A.2d 639, 640 (1988) (noting, in rejecting department's claim of inadequate findings, that board made multiple findings and thoroughly evaluated evidence, including testimony of experts, before making its own independent judgment on rate of return).

---

[6] AARP also asserts a second reason to reverse the Commission's decision based on inadequate factfinding. According to AARP, the Commission had a duty under 3 V.S.A. § 812, which concerns decisions and orders in contested cases in administrative proceedings, to "include a ruling upon each proposed finding." On two occasions, we have explicitly rejected the same argument, reasoning that "[t]he purpose of this requirement is to make a clear statement to the litigants, and to this Court if an appeal is taken, of what was decided and how the decision was reached." Secretary, Ag. of Nat. Res. v. Upper Valley Reg. Landfill Corp., 167 Vt. 228, 241-42, 705 A.2d 1001, 1009 (1997) (quotation omitted); see In re Vill. of Hardwick Elec. Dep't, 143 Vt. 437, 445, 466 A.2d 1180, 1184 (1983) (rejecting petitioner's contention that Commission had duty under 3 V.S.A. § 812 to rule on each individual proposed finding and stating that "it is sufficient if the record shows that the [Commission] considered and decided each proposed finding"). In this case, AARP's proposed findings essentially tracked the Department's expert testimony about VGS's mismanagement in the early stages of the ANGP and acknowledged that VGS began to utilize reasonable project management practices after the February 2014 risk assessment was completed.

## C. Penalty for Imprudent Costs

¶ 25. AARP also briefly argues that neither the evidence nor the Commission's findings support its conclusion that limiting VGS's ROE to 8.5% for a three-year period was a sufficient penalty for the imprudent ANGP-related costs. AARP contends that there is no evidence to support the Commission's unexplained finding that limiting the ROE to 8.5% for the three-year period would result in a reduced net income for VGS of between $1.8 and $4.4 million as compared to net income calculated using the Department's and VGS's proposed ROE rates of 9% and 9.7%.

¶ 26. With regard to this argument, we first point out that the question of what costs should be disallowed as imprudently incurred is distinct from the question of whether—and, if so, the extent to which—VGS should be penalized for its mismanagement in incurring imprudent costs. We make this point because the Commission, despite stating that the ANGP-related imprudent costs did not exceed the $31 million in disallowed costs, also indicated that it was accepting the reduced ROE as a means of closing any gap between the $35 million in imprudent costs initially alleged by the Department's expert and the $31 million of disallowed costs agreed upon by VGS and the Department.

¶ 27. AARP does not challenge the ROE as excessive, but rather challenges it only as an insufficient penalty for imprudent costs being added to the rate base. Hence, if the evidence and the Commission's additional findings on remand support a determination that the $31 million in disallowed costs exceeds the amount of imprudent costs associated with the Addison County project, then AARP's challenge to the impact of the reduced ROE is negated because it is ultimately contingent upon the assertion that some of the ANGP-related costs allowed by the Commission as part of the rate base were not just and reasonable. In short, the Commission was not required to impose an additional penalty for imprudent costs beyond the effective $31 million in disallowed costs; if no imprudent costs will be passed onto ratepayers, AARP cannot prevail on its argument that the ROE penalty imposed by the Commission for imprudent costs was insufficient.

12

¶ 28.    On the other hand, if in fact the ROE cap was imposed to make up for imprudent costs that are being allowed into the rate base, the Commission has failed to explain, and we cannot decipher from the evidence, how that ROE reduction over a three-year period would be the equivalent to disallowing from the rate base any imprudent costs beyond the $31 million. Even if reducing the ROE is an acceptable way of making up for imprudent costs allowed into the rate base—a question we do not decide here—any calculation for offsetting the effect of the imprudent costs into the rate base would be complex and speculative, as it would have to account for the impact on rates far beyond the three-year period in which the Commission capped VGS's return on equity. Here, although VGS presented evidence as to the potential loss to the company resulting from the capped ROE, no evidence demonstrates that the ROE reduction would make up for any unstated amount of imprudent costs that was not disallowed. Thus, we cannot resolve this issue pending a final resolution of whether the $31 million in effective disallowed costs exceeded VGS's ANGP-related imprudent costs.

### D. Used and Useful

¶ 29.    Next, AARP challenges the Commission's finding—in response to AARP's contention that costs attributable to constructing a twelve-inch rather than a ten-inch pipeline should be disallowed as unused—that no party presented testimony on the proper size for the ANGP pipeline. In support of this argument, AARP relies upon its cross-examination of VGS's vice-president, in which the witness acknowledged that: (1) in her 2013 prefiled testimony submitted in the CPG proceeding she stated that Addison County could be adequately served using a ten-inch pipeline, but doing so would require twenty-five more miles of sixteen-inch pipeline to serve Rutland County; and (2) VGS had no active plans to serve International Paper or Rutland County in the future. The witness further stated that she did not know what the difference in cost

would be to construct a twelve-inch rather than a ten-inch pipeline in Addison County because the company did not have a CPG for a ten-inch pipeline and was not building a ten-inch pipeline.[7]

¶ 30.    According to AARP, this brief cross-examination of the VGS vice-president demonstrates that the Commission clearly erred in finding that no party presented testimony on the appropriate size for the ANGP pipeline.  AARP further argues that because VGS no longer has plans to expand its services to International Paper or Rutland County, any additional cost in constructing a twelve-inch rather than a ten-inch pipeline cannot be passed onto ratepayers under the test set forth in In re New England Telephone and Telegraph Company, 115 Vt. 494, 505-06, 66 A.2d 135, 142 (1949) (stating that test generally applied "in dealing with the question of property held for future use . . . is whether the time for using the property in question is so near that it may properly be held to have the quality of working capital").

¶ 31.    We find AARP's argument unavailing.  The Commission's finding that no party in this proceeding submitted evidence of the appropriate size of the pipeline is not clearly erroneous. AARP merely elicited a single statement indicating that at the time the CPG was granted years earlier a VGS witness testified that the Addison market could be adequately served using a ten-inch pipeline.  Even assuming that the acknowledgment of testimony from a prior proceeding constituted evidence of the appropriate size of the pipeline for purposes of this rate proceeding, VGS had a CPG for a twelve-inch pipeline and there was no evidence of any additional independent cost for the enlarged pipeline.

¶ 32.    In its previous order granting VGS a CPG that included a proposal for a twelve-inch pipeline, the Commission expressly stated that its approval was based on its conclusion that the project promoted the general good based on the merits of the Addison expansion alone, irrespective of whether the later planned expansions to International Paper or Rutland County took

---

[7] The witness also stated that the CPG VGS filed for expanding gas services into Addison County called for increasing the diameter of the pipeline from ten to twelve inches and increasing the length of the transmission system, which added $20 million to the budget.

place. Future expansion, though a potential future benefit, was not an essential component of the approval. Although VGS no longer had active plans in place to expand services to International Paper or Rutland County, the pipeline was expected to provide service for several decades. Cf. In re Latourneau v. Citizens Util. Co., 125 Vt. 38, 44-45, 209 A.2d 307, 313 (1965) (stating that Commission made no finding indicating utility used poor business judgment in constructing expanded transmission line and that, although there was disagreement on exact date expanded line "would be used at its full . . . capacity, there was no disagreement that such use would come well within the life of the transmission line"). Accordingly, we find no basis to reverse the Commission's decision not to consider, as not used and useful for this rate period, costs incurred in constructing a twelve-inch rather than a ten-inch pipeline.

## E. Cross-Subsidization

¶ 33. Finally, AARP argues that the Commission erred in concluding that it had the authority to impose a substantial subsidy in favor of new customers. According to AARP, the Commission's ratemaking decision in this proceeding constitutes a deliberate subsidization of new customers by existing customers without specific legislative authorization, in violation of 30 V.S.A. § 218(a), which prohibits "unjustly discriminatory" or "preferential" rates. Noting that the Commission adopted SERF under the purported authority of the alternative regulation statute, 30 V.S.A. § 218d, AARP argues that nothing in the statue authorizes use of ratepayer funds to subsidize system expansion. In making this argument, AARP maintains that this is the first opportunity to challenge the Commission's decision not to return SERF funds to ratepayers because this is the first proceeding in which VGS has sought permission to use SERF funds to pay for its system expansion.[8]

---

[8] We agree. Because this is AARP's first opportunity to fully litigate this issue in the context of an actual ratemaking proceeding, we reject VGS's argument that we should not reach the merits of AARP's claim of error.

¶ 34. As noted above, the Commission approved the establishment of SERF in 2011 as an amendment to VGS's ARP. Section § 218d(d) provides that "the Commission shall not allow a company to set aside funds collected from ratepayers for the purpose of supporting a future expansion or upgrade of its transmission or distribution network except after notice and opportunity for hearing and only if" certain specified criteria are met.

¶ 35. As AARP acknowledges, and as the Commission explained in detail in the CPG proceeding, some cross-subsidization is unavoidable and appropriate. In this proceeding, the Commission rejected AARP's argument that allowing VGS to withdraw $5.5 million from SERF for fiscal year 2017 to attain a zero percent change in non-gas rates constituted an unlawful cross-subsidization of new customers by existing customers. After finding that the SERF balance was expected to be $24.7 million by the beginning of the rate year and that an additional $5.1 million would be collected during the rate year, the Commission concluded that the $5.5 million SERF withdrawal permitted under the MOU was a reasonable measure to smooth rates as VGS began to collect ANGP-related costs from ratepayers. The Commission noted that any further SERF withdrawals would be considered in future ratemaking proceedings and that, pursuant to the MOU, the SERF balance would be returned to customers by the end of 2021, at which time the SERF collections would end.

¶ 36. We conclude that the Commission acted within its broad discretion in authorizing a $5.5 million withdrawal of SERF funds to allow VGS to attain a zero percent change in non-gas rates for fiscal year 2017. See In re Consol. Rate Appeals of Green Mt. Power Corp., 142 Vt. 373, 380, 455 A.2d 823, 825 (1983) (stating that Commission's choices with respect to setting rates "are subject to great deference in this Court so long as it can be shown they are directed at proper regulatory objectives"). In the CPG proceeding, the Commission explained that generally SERF would benefit all customers, including existing customers, by providing contributions to the fixed costs of the overall system for the life of the expanded pipeline. In this proceeding, AARP fails to explain how the Commission erred when it concluded that the permitted level of SERF withdrawal

in fiscal year 2017 does not constitute an excessive cross-subsidization of new ratepayers by existing ratepayers.

The matter is reversed and remanded for the Commission to make further findings on the amount of ANGP-related imprudent costs. If the Commission determines that it is imposing a reduced ROE to make up for any imprudent costs that are not being disallowed, it must make further findings and conclusions to explain how that penalty would fully compensate for any imprudent costs allowed into the rate base.

FOR THE COURT:

_____
Associate Justice