EATON, J.
¶ 1. Travis Belisle appeals the Public Utility Commission's (PUC)[1] grant of partial summary judgment in favor of the Department of Public Service (DPS) on the question of whether Belisle violated 30 V.S.A. § 246 by constructing a meteorological tower on his land in Swanton without a certificate of public good (CPG). Belisle also appeals the PUC's imposition of a $ 10,000 fine for the violation following an evidentiary hearing. We affirm the PUC's determination that the construction of the tower without a CPG was a violation of applicable law, but reverse and remand for consideration of the appropriate penalty.
¶ 2. The factual and procedural history is as follows. In 2010, Belisle consulted with Vermont Environmental Research Associates (VERA) to monitor the wind on top of the ridge on his property. On November 1, 2010, Belisle filed a document with the Swanton town clerk entitled "Declaration of Planned Community for Rocky Ridge." In the document, Belisle stated he "may develop ... an electrical generation wind farm" on his property. In January 2011, Belisle consulted with VERA for a proposal to install a meteorological tower on the property to see what the wind was like on the ridge. In January 2012, a tower standing 132 feet high and measuring six inches in diameter was installed on Belisle's property. Belisle did not obtain a CPG before the installation.
¶ 3. In July 2015, neighbors of Belisle filed a letter with the PUC alleging a meteorological tower had been constructed on Belisle's property. Shortly thereafter, the PUC directed DPS to investigate the neighbors' allegations. Later that month, DPS recommended that the PUC open an investigation regarding the construction of the tower without a CPG, which it did. A lengthy procedural history followed, ultimately resulting in DPS's filing a motion for partial summary judgment and Belisle filing a cross-motion for summary judgment. Belisle claimed the PUC lacked jurisdiction over his construction of the tower because he had no specific wind generating facility in mind at the time he constructed the tower, and thus no CPG was required under 30 V.S.A. § 246. Belisle argued that for a CPG to be required under § 246, a proposed tower must meet three elements: (1) the installation is temporary; (2) the installation is for the purpose of determining a particular location's suitability for a wind turbine; and (3) the future wind turbine will be grid connected. DPS claimed Belisle's admission that he constructed the tower to "see[ ] if the wind on the ridge would be right for wind turbines that generate electricity" was sufficient to trigger the need for a CPG pursuant to 30 V.S.A. § 246.
*1233 ¶ 4. The PUC granted DPS's partial summary judgment motion and denied Belisle's. In rejecting Belisle's position and his proposed standard for determining the need for a CPG in the meteorological-tower context, the PUC found that an intent to construct a meteorological tower to assess wind resources for a prospective wind project was sufficient to trigger the CPG requirement under § 246. The PUC reasoned that a CPG was required because Belisle "erected the tower ... for use in developing an electrical generation wind farm thus placing [him] under the [PUC]'s jurisdiction pursuant to Title 30" and that Belisle "did not obtain a [CPG] as required by 30 V.S.A. § 248 prior to erecting the tower." (Quotation omitted.) The PUC thus found Belisle in violation of §§ 246 and 248 and scheduled further proceedings to determine the appropriate penalty and remedial action.
¶ 5. An evidentiary hearing was held in September 2017 regarding the penalty to be assessed as a result of the violation and to consider what, if any, remedial action would be required. DPS asserted that the provisions of 30 V.S.A. § 246, which incorporate provisions of 30 V.S.A. § 248, made § 248 applicable to this permit violation. As a result, DPS further asserted the appropriate penalty should be assessed under 30 V.S.A. § 30(a)(1), which applies to violations of § 248. Although contesting any violation, Belisle claimed any appropriate penalty should be calculated under 30 V.S.A. § 30(a)(2), which he claimed applied to violations of § 246. A violation subject to § 30(a)(1) has a maximum penalty of $ 40,000, absent continuing violation, while a violation subject to § 30(a)(2) has a maximum penalty of $ 10,000. The PUC reasoned that because § 246 made the erection of a wind tower to determine the suitability of the site for a grid-connected wind generating facility subject to the supervision of the PUC under § 248, the penalty should be assessed according to § 30(a)(1). After considering the factors in § 30(c), which are applicable to any violation of § 30(a), the PUC imposed a fine of $ 10,000. The PUC also ordered remedial measures at the tower site.
¶ 6. Belisle appealed, renewing his argument that the PUC lacked jurisdiction over his establishment of the meteorological tower because no CPG was required by § 246 or otherwise and that if a CPG was required, then the PUC erred in calculating the appropriate penalty. He also makes claims of factual errors, which we will discuss in context throughout our analysis.
I. Standard of Review
¶ 7. As explained above, the PUC considered the matter at hand in two phases-first when granting partial summary judgment in favor of DPS on the issue of whether a violation had occurred and second with an evidentiary hearing when determining the appropriate penalty for Belisle's violation.[2] Different standards of review apply to these two proceedings-we review the PUC's summary judgment determination de novo, and we review the PUC's penalty determination for abuse of discretion. Throughout, we give deference *1234 to legal conclusions within the PUC's area of expertise.
¶ 8. On appeal, this Court reviews the grant of summary judgment de novo, applying the same summary judgment standard as the PUC applies in the first instance-summary judgment is appropriate if there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. Farrell v. Vt. Elec. Power Co., 2012 VT 96, ¶ 9, 193 Vt. 307, 68 A.3d 1111 ; V.R.C.P. 56(a). "The party opposing summary judgment is given the benefit of all reasonable doubts and inferences." Farrell, 2012 VT 96, ¶ 9, 193 Vt. 307, 68 A.3d 1111.
¶ 9. Regarding our review of legal issues within the PUC's area of expertise, this Court reviews PUC decisions with "great deference to the [PUC's] expertise and judgment," allowing for "a strong presumption of validity to the [PUC's] orders." In re UPC Vt. Wind, LLC, 2009 VT 19, ¶ 2, 185 Vt. 296, 969 A.2d 144 (quotation omitted). We affirm the PUC's findings and conclusions are affirmed "unless they are clearly erroneous." Id. ; see also In re Citizens Utils. Co., 171 Vt. 447, 450, 769 A.2d 19, 23 (2000) ("We accept the [PUC's] findings and conclusions unless the appealing party demonstrates that they are clearly erroneous, and, in reviewing those findings and conclusions, we defer to the [PUC's] particular expertise and informed judgment."). "Absent a compelling indication of error, we will not disturb an agency's interpretation of statutes within its particular area of expertise." In re Verizon New Eng. Inc., 173 Vt. 327, 334-35, 795 A.2d 1196, 1202 (2002).
¶ 10. Finally, the PUC's decision to set and impose a penalty is within its discretion and will be upheld as long as it "shows a thorough and fair evaluation of the various relevant factors." Citizens Utils. Co., 171 Vt. at 457, 769 A.2d at 29.
II. Sections 246 and 248
¶ 11. First, Belisle argues that § 246 rather than § 248 of Title 30 governs the CPG requirements for the establishment of a temporary meteorological tower. Here, the PUC applied §§ 246 and 248 to determine whether it had jurisdiction over the matter at hand and whether Belisle's project required a CPG. To the extent that there has been confusion regarding whether to apply § 246 or § 248, or some combination of the two, when determining PUC jurisdiction and CPG requirements for temporary meteorological towers, we now clarify that § 246 governs such inquiries, and we reject the PUC's analysis to the contrary.
¶ 12. We begin with our principles of statutory construction. "The bedrock rule of statutory construction is to determine and give effect to the intent of the Legislature." In re C.S., 158 Vt. 339, 343, 609 A.2d 641, 643 (1992). "If the statute is unambiguous and the words have plain meaning, we accept that plain meaning as the intent of the Legislature and our inquiry proceeds no further." Springfield Terminal Ry. v. Agency of Transp., 174 Vt. 341, 346, 816 A.2d 448, 453 (2002). If a statute is ambiguous, however, "legislative intent must be determined through consideration of the entire statute, including its subject matter, effects and consequences, as well as the reason and spirit of the law." Tarrant v. Dep't of Taxes, 169 Vt. 189, 197, 733 A.2d 733, 739 (1999).
¶ 13. Here we are construing both § 246 and § 248. The plain language of § 246 clearly indicates that § 246 governs the CPG process for meteorological towers. The title of § 246 is "Temporary siting of meteorological stations"; § 246(a) states, "in this section, a 'meteorological station'
*1235 consists of one temporary tower ... to collect and record wind speed, wind direction, and atmospheric conditions"; and § 246(b) directs the PUC to establish "standards and procedures governing application for, and issuance or revocation of, a certificate of public good." Thus, according to our rules of statutory construction, we accept the plain language of § 246 and proceed no further.
¶ 14. What is less clear is whether § 246 governs temporary meteorological stations alone or whether § 248 also applies. Section 246 indicates that the PUC should create a separate, streamlined process governing CPGs for temporary meteorological towers, but it also references § 248 in doing so, drawing on § 248's criteria. 30 V.S.A. § 246(b). And § 248(a)(2)(A) directs that "no company ... may begin site preparation for or construction of an electric generation facility" without first obtaining a CPG.[3] This is broad language that arguably could include the construction of a meteorological tower. This ambiguity regarding the reach of § 248 is amplified by the penalty provisions under 30 V.S.A. § 30(a). Section 30(a)(1) provides a penalty for violations of § 248, while § 30(a)(2) provides a penalty for violations of other provisions in chapters three or five of Title 30, including § 246. This distinction is important because § 30(a)(1) permits a higher penalty than § 30(a)(2) and the analysis the PUC must engage in is different under each provision.
¶ 15. Given this ambiguity, we must turn to the traditional tools of statutory construction to discern the intent of the Legislature. See Tarrant, 169 Vt. at 197, 733 A.2d at 739. We conclude that the Legislature intended for § 246 to govern whether and how to obtain a CPG for temporary meteorological towers as an independent statutory scheme and that § 248 does not apply except as incorporated within § 246. We come to this conclusion because of the language, history, and context of the statutory scheme as a whole. See Tarrant, 169 Vt. at 197, 733 A.2d at 739 ("[L]egislative intent must be determined through consideration of the entire statute, including its subject matter, effects and consequences, as well as the reason and spirit of the law.").
¶ 16. First, the language of § 246 indicates that it operates alone. As we explained, § 246 is not unambiguous, but its language strongly suggests that the Legislature did not intend § 246 to operate in conjunction with § 248. Rather, it appears that § 246 incorporates certain environmental criteria from § 248, but otherwise operates as an independent scheme. It references § 248's criteria in § 246(b), but it creates a distinct, independent process for obtaining a CPG, which is specifically designed for temporary meteorological towers.[4] Further, § 246(b) directs the PUC to *1236 create "standards and procedures" for obtaining a CPG in this context. In 2010, the PUC adopted an order for this purpose and implemented a distinct, independent process for obtaining CPGs for temporary meteorological towers. State of Vt. Pub. Serv. Bd., Order Establishing Standards and Procedures [hereinafter 2010 Order], https://puc.vermont.gov/sites/psbnew/files/doc _library/standards-procedures-meteorologicaltowers.pdf [https://perma.cc/AH8D-VC3T]. The 2010 Order does not plainly state whether § 246 should be understood as an independent statutory scheme. But just as in § 246, the Order borrows certain criteria from § 248 and otherwise operates independently.
¶ 17. This interpretation is further supported by the distinct nature of the projects approved pursuant to §§ 246 and 248. Temporary meteorological stations generate data, not electricity, and they may or may not require a CPG depending on whether they are intended to help develop a future grid-connected project. They do not pose the same risk of negative impacts as the grid-connected electricity-generation projects regulated by § 248. The PUC's 2010 Order acknowledges this distinction. See 2010 Order at 2 (explaining that "[t]he (PUC's) conditional waiver of § 248 criteria is based on the limited potential for impact presented by the majority of temporary meteorological stations under those criteria"); see also § 248(b) (listing criteria PUC must consider when issuing CPG for electricity-generating projects, including regional development, demand for electricity service, and stability and reliability of electricity system).
¶ 18. The penalty provisions under 30 V.S.A. § 30 also support our analysis. As explained above, violations of § 248 have significant impact on electricity-generation in Vermont. Accordingly, § 30(a)(1) provides a penalty scheme to account for the severity of these violations, allowing a maximum penalty of up to $ 40,000. In contrast, § 30(a)(2) requires a smaller penalty for violations of provisions with less impact, such as violations of § 246. Id. § 30(a)(2) (limiting penalty for violations of chapter 3 or 5 of Title 30 except for provisions of §§ 231 or 248 to "not more than" $ 10,000). Temporary meteorological stations, such as Belisle's, do not generate electricity or connect to the grid, and they *1237 do not have the same kind of impact as the grid-connected projects regulated under § 248. Therefore, it is appropriate that the potential maximum penalty for violations of § 246 would be less than the maximum penalty for violations of § 248.
¶ 19. We also find it helpful to be mindful of the history of §§ 246 and 248. Section 248, originally enacted in 1969, establishes requirements for CPG approval for in-state electric transmission and generation projects. Id. § 248(b)(1)-(11); 1969, No. 69, § 1. These criteria are generally applicable to public service companies preparing to construct an electricity-generating project or facility within the state. See ibr.US_Case_Law.Schema.Case_Body:v1">id. § 201 (defining "companies"); see also ibr.US_Case_Law.Schema.Case_Body:v1">id. § 248(a)(2)(A) (directing that "no company, as defined in section 201 of [Title 30] ... may begin site preparation for or construction of an electric generation facility ... within the State" without first obtaining CPG). The criteria are extensive and were not geared toward temporary meteorological towers, which, unlike other projects governed by § 248, are temporary constructions that do not produce electricity. Section 246 was adopted in 2008, almost forty years after § 248. It was clearly written to account for temporary meteorological towers, as distinct from the electricity-generating facilities governed by § 248. In general, when two statutes appear to apply to the same situation in conflicting ways, and one statute is enacted later and is more specific than the other statute, we construe the later-enacted and more-specific statute as controlling. Hartford Bd. of Library Trs. v. Town of Hartford, 174 Vt. 598, 599, 816 A.2d 512, 515 (2002) (mem.); see also In re Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 31, 199 Vt. 19, 121 A.3d 630 ("[A] commonly recognized method for reconciling conflicting statutory provisions is to hold the specific provision as an exception to the general.").
¶ 20. Based on the language, history, and context of the statutory scheme as a whole, we conclude that the Legislature intended for § 246 to operate as an independent scheme from § 248. Therefore, § 246 governs our analysis as to whether a CPG was required for Belisle's temporary meteorological station. Additionally, failure to comply with § 246 would result in a violation of § 246, not § 248.[5] To the extent the PUC's conclusion *1238 relied on the PUC's jurisdiction under § 248, such analysis was in error. See Verizon New Eng. Inc., 173 Vt. at 334-35, 795 A.2d at 1202 ("Absent a compelling indication of error, we will not disturb an agency's interpretation of statutes within its particular area of expertise."). We affirm the PUC's conclusion that Belisle committed a violation under Title 30 by not obtaining a CPG on the basis that his actions constituted a violation of § 246. See Sorge v. State, 171 Vt. 171, 174 n.*, 762 A.2d 816, 818 n.* (2000) ("This Court may affirm a trial court's decision if the correct result is reached, despite the fact that the court based its decision on a different or improper rationale.").
III. Whether Belisle's Project Is a "Temporary Meteorological Station" Pursuant to § 246
¶ 21. The next issue we must address is whether the PUC erred in granting DPS's motion for summary judgment based on the PUC's conclusion that Belisle's meteorological tower qualified as a "temporary meteorological station."[6] Belisle argues that he did not have plans for a grid-connected project that were concrete enough at the time he installed his tower to require a CPG under § 246, and therefore the PUC lacked jurisdiction over the tower and erred in granting DPS's summary judgment motion. The PUC determined that Belisle's lack of specific plans did not excuse him from § 246's requirements because "the undisputed facts indicate[d] that at the time [Belisle] authorized the erection of the tower in 2012, he did so to collect data for use in developing an 'electrical generation wind farm.' " Therefore, the PUC concluded that Belisle's tower met the definition of a "temporary meteorological station" under § 246 and required a CPG. As explained below, even applying the summary judgment standard in Belisle's favor, the undisputed facts support the PUC's determination that Belisle's tower was a temporary meteorological *1239 station within the PUC's jurisdiction and that he violated § 246 when he established the tower without first obtaining a CPG. Farrell, 2012 VT 96, ¶ 9, 193 Vt. 307, 68 A.3d 1111 (explaining that when considering motion for summary judgment, decisionmaker must accept as true all properly supported allegations presented by nonmoving party and resolve all reasonable inferences and doubts in nonmoving party's favor). We find no error.
¶ 22. First, we must review both the definition of a "temporary meteorological station" pursuant to § 246 and the standard applied by the PUC to determine whether a project meets this definition. The standards and procedures the PUC promulgated in 2010 define a "temporary meteorological station" as "a temporary tower, which may include guy wires, and attached instrumentation to collect and record wind speed, wind direction, and atmospheric conditions, constructed or installed in order to determine the suitability of a site for the location of a grid-connected wind turbine." 2010 Order at 6 (emphases added).[7] Thus, the PUC's jurisdiction to regulate a project is triggered when the project is temporary[8] and it was constructed or installed to determine a site's suitability for a grid-connected wind project. To determine whether a project was "constructed or installed to determine the suitability of a site for the location of a grid-connected wind turbine," the PUC applies the "reasonably related" test.
¶ 23. Prior to § 246 and the 2010 Order, the PUC concluded that a meteorological tower that is "reasonably related" to the potential operation of a wind generation facility is within the jurisdiction of the PUC pursuant to § 248. UPC Wind Mgmt., LLC, No. 6884 at 6 (Vt. Pub. Serv. Bd. April 21, 2004), https://puc.vermont.gov/sites/psbnew/files/orders/2004/6884fnlorder.pdf [https://perma.cc/3FX9-B3BG] (adopting "reasonably related" standard articulated in Attorney General's 1971 advisory opinion, rather than more stringent *1240 "directly related" standard, but concluding that when tower is "necessary precursor" to wind generation project it satisfies both standards); see also Vt. Elec. Coop., Inc., No. 7201 at 7 (Vt. Pub. Serv. Bd. Aug. 24, 2006), https://puc.vermont.gov/sites/psbnew/files/orders/2006/7201fnl.pdf [https://perma.cc/5ECH-K3 ZQ] ("[The] reasonably related standard governs the [PUC]'s review of Section 248 projects."). However, the "reasonably related" standard has not been applied consistently or clearly in reviewing §§ 248 and 246 applications. See Endless Energy Corp., No. 6154, 2008 WL 5273737, at *1 (Vt. Pub. Serv. Bd. Dec. 11, 2018) (applying "directly related" standard to § 248 petition and amendment of petition for temporary meteorological tower issued prior to 2010 Order); see also Dairy Air Wind, LLC, No. 8837, 2017 WL 1344511 (Vt. Pub. Serv. Bd. Apr. 6, 2017) (granting §§ 248 and 246 application, but not referencing "reasonably related" test); Atl. Wind, LLC, No. 7905, 2012 WL 6706195 (Vt. Pub. Serv. Bd. Dec. 20, 2012) (granting §§ 248 and 246 applications, but not referencing "reasonably related" test).
¶ 24. Following the enactment of § 246, the 2010 Order implicitly adopted the "reasonably related" test for use in § 246 applications, and the PUC has applied the "reasonably related" test in reviewing CPG requirements for temporary towers, including the matter at hand. See 2010 Order at 5 (explaining PUC retained § 3.1(b) of application to help application reviewers "determine whether a meteorological station is reasonably related to a potential generation facility, and thus under [PUC] jurisdiction" (emphasis added)); Meteorological Tower at 700 Kidder Hill Road in Irasburg, Vt., No. 8585 at 5 (Vt. Pub. Util. Comm'n June 22, 2018) (applying "reasonably related" standard in context of § 246 and stating that "[t]he purpose behind the construction of a MET tower is important for determining whether the [PUC] has jurisdiction over a tower because for jurisdiction to attach the tower must be 'reasonably related' to a generation facility"); Constr. & Operation of a Meteorological Tower in Swanton, Vt., No. 8561, 2018 WL 1064851, at *15 (Vt. Pub. Util. Comm'n Feb. 22, 2018) (explaining that in UPC Wind Management, LLC, No. 6884, PUC "concluded that a meteorological tower that is 'reasonably related' to the potential operation of a wind generation facility is within the jurisdiction of the [PUC] pursuant to Section 248" and that " Section 246 did not ... create a new jurisdictional basis for considering such towers").[9]
*1241 ¶ 25. In sum, we conclude that the application of the "reasonably related" standard in the context of § 246 proceedings comports with PUC precedent and the history of the relationship between §§ 248 and 246. A temporary meteorological tower is within PUC jurisdiction under § 246 if it is "reasonably related" to construction or establishment of a grid-connected wind generation facility.
¶ 26. As with many things, the devil is in the details. To date, neither the PUC nor this Court has expressly outlined a consistent method for determining when a temporary meteorological tower is "reasonably related" to a grid-connected wind generation facility. We do so here. To establish that a temporary meteorological tower satisfies the "reasonably related" standard and is within PUC jurisdiction under § 246, an objective review of the circumstances must demonstrate that the tower was constructed or installed to help determine the site's suitability for a grid-connected wind turbine. Such inquiries will be fact intensive and determined on a case-by-case basis. See Thompson v. Hi Tech Motor Sports, Inc., 2008 VT 15, ¶ 6, 183 Vt. 218, 945 A.2d 368 (applying totality-of-circumstances test to determine whether waiver of liability was void because in fact-intensive cases it is difficult to apply "formulaic approach"-"no single formula will reach the relevant public policy issues in every factual context" (quotation omitted)). To demonstrate that a tower was established to help determine a site's suitability for a grid-connected wind turbine, the reviewer may rely on a host of factors, including-but not limited to-the station's size and scope, the project proponent's actions and outward manifestations of intent, the project proponent's statements of subjective intent, the existence of plans for a grid-connected wind turbine, and subsequent development of a grid-connected project.[10] See, e.g., Dairy Air Wind, LLC, 2017 WL 1344511, at *5-6, 16 (granting CPG to erect 196.9-foot-tall tower that applicant expressly stated would be used to evaluate wind resource characteristics at site in connection with proposed 2.2 MW grid-connected wind-turbine facility); Seneca Mountain Wind, LLC, No. 7867, 2013 WL 4398965, at *6, 56 (Vt. Pub. Serv. Bd. Aug. 9, 2013) (granting CPG to company to build four towers not to "exceed 200 feet in height"); Atl. Wind, LLC, 2012 WL 6706195, at *1 (granting CPG for company to build three 197-foot-tall towers); Endless Energy Corp., 2008 WL 5273737, at *1 (determining PUC lacked jurisdiction to amend CPG under "directly related" standard because petition information expressly indicated that eighty-foot-tall tower would be used for "general wind testing and measurement purposes" and not for wind measurement or data collection for proposed generation facility).
¶ 27. Based on the test outlined above and the undisputed facts before the PUC, we agree with the PUC's conclusion that, as a matter of law, Belisle's tower was "reasonably related" to the establishment of a potential grid-connected wind generation facility because an objective review of the circumstances surrounding the tower's construction demonstrates that it was established to help assess the site's suitability for a future grid-connected wind *1242 turbine. The PUC considered Belisle's actions, both prior to and following the establishment of the temporary meteorological tower in 2012, as well as Belisle's statements both before and after the investigation started when determining the tower's relationship to a potential grid-connected wind facility. Several of Belisle's actions and outward manifestations of intent were of particular relevance to the PUC's analysis.
¶ 28. First, prior to erecting the tower, in November 2010, Belisle filed a document with the town clerk in Swanton, Vermont, entitled "Declaration of Planned Community for Rocky Ridge," which stated that Belisle "may develop ... an electrical generation wind farm" on his property. Second, in January 2012, Belisle received a proposal from VERA to install a meteorological tower. He established the tower at issue shortly thereafter. Finally, Belisle's stated purpose for erecting the tower was to determine "if wind on the ridge would be right for wind turbines that generate electricity." The PUC concluded that these facts, taken in context, demonstrated that Belisle's temporary tower was established to help assess the site's suitability for a potential grid-connected project.
¶ 29. Belisle argues that his project does not satisfy the "reasonably related" standard because he had no specific plans to create a grid-connected wind turbine in 2012 when he erected the temporary tower. We disagree-Belisle's declaration regarding plans for the Rocky Ridge Community, his consultation with VERA, his establishment of the temporary tower for data collection, and his statements regarding his purpose in erecting the tower establish as a matter of law that his tower was installed to help determine the site's suitability for a grid-connected wind project.
¶ 30. Belisle also argues that his statements made after the investigation started, which indicated that he had no specific plans to construct a grid-connected wind project at the time he established the temporary tower, are dispositive to our inquiry. In his prefiled testimony and responses to DPS's information requests, Belisle explained that he established the tower to "see what the wind was like on top of the ridge" and to "see if the wind on the ridge would be right for wind turbines that generate electricity." When asked directly if he installed the tower for the purpose of determining the suitability of the site for a grid-connected wind project, Belisle said, "No," and stated that he "had no specific plans or project in mind." The PUC concluded that these statements indicated that, though Belisle had no specific plans at the time he constructed the tower, he was curious about the type of wind on the ridge and he was open to discovering what type of project, if any, would be feasible-including a grid-connected wind project.
¶ 31. While project proponents' outward statements regarding their subjective intent behind establishing a temporary tower may be a factor in demonstrating whether a tower was constructed to assess a site's suitability for a potential grid-connected wind facility, such statements must be assessed objectively in the context of the entire project. To hold otherwise would enable a party to escape both an impartial assessment of the setting of the case under the "reasonably related" standard and summary judgment by simply denying any intent after the fact. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) (holding in context of discrimination suit, "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman *1243 to defeat an otherwise valid motion"); see also Pierce v. Riggs, 149 Vt. 136, 138, 540 A.2d 655, 657 (1987) ("[W]hen entertaining a [Vermont Rule of Civil Procedure] 56 motion for summary judgment, the trial court is required to consider the entire setting of the case .... [T]he entire record is to be considered.").
¶ 32. The PUC correctly concluded that, even in the context of a motion for summary judgment and giving his statements full credence as the nonmovant, Belisle's denial does not create an issue of material fact considering the entire setting of the case. Drawing any doubts or inferences about Belisle's plans at the time he established the tower in his favor, Belisle's statements demonstrate that he had no specific plans for a grid-connected wind turbine, but he was considering a wind project on the ridge and using the temporary tower to determine what type of project would be feasible. Therefore, even taking his statements as true, the PUC had sufficient information to conclude that, regardless of Belisle's intent, the tower was constructed to establish the site's suitability for a potential grid-connected project. Taken in context of the entire case, Belisle's assertion that he did not have specific plans for a particular type of generating facility when he established the tower is insufficient to affect the outcome of the analysis or create an issue of material fact. O'Brien v. Synnott, 2013 VT 33, ¶ 9, 193 Vt. 546, 72 A.3d 331 ("The issue is material only if it might affect the outcome." (quotation omitted)). Belisle's subjective lack of intent, while a factor to consider, is not determinative and does not preclude summary judgment in DPS's favor, even giving full credence to the statement.
¶ 33. Based on Belisle's statements, actions, and outward manifestations of intent-including his application for the Rocky Ridge Community, his consultations with VERA, and his stated interest in determining what type of wind was available on the ridgeline for wind turbines-the PUC determined that Belisle's tower was "reasonably related" to determining the site's suitability for a grid-connected wind turbine. We conclude that, based on the circumstances, Belisle's tower meets the definition of a "temporary meteorological station" pursuant to § 246. Belisle's tower falls within the PUC's jurisdiction under § 246 and, accordingly, required a CPG prior to its construction. The undisputed facts established DPS was entitled to summary judgment.
¶ 34. Appellant challenges several of the PUC's evidentiary rulings and raises additional arguments opposing the PUC's jurisdiction, which we do not find persuasive.
¶ 35. First, Belisle contests certain facts that the panel determined were undisputed. He argues that the PUC's statement of undisputed fact that VERA was performing a "site suitability assessment" on the ridge has no support in the record. He also argues that the PUC's finding during the penalty phase that the data from the tower was "not dispositive of all project funding and development concerns," but "was necessary to design and finance the proposed Swanton Wind project," is erroneous because the data that the station collected were "not sufficient to design or finance a wind project" like Swanton Wind and "[a]dditional data" were needed. Belisle's statement of undisputed facts explained that he received a proposal from VERA to install a meteorological station on his property and that he erected the tower to collect data and see what the wind was like on top of the ridge. Therefore, whether VERA conducted a "site suitability assessment" does not impact the PUC's conclusion that Belisle was interested in using the temporary tower to assess the wind resources for a potential wind project on the ridge. The undisputed facts established *1244 that DPS was entitled to summary judgment. Similarly, whether data from the tower were directly used to support the Swanton Wind project was discussed during the penalty phase, not the summary judgment phase, and does not impact our conclusion on the propriety of summary judgment on liability under § 246.[11]
¶ 36. Regarding the PUC's jurisdiction pursuant to § 246, Belisle argues that if an owner does not have specific plans for a grid-connected electric-generation facility, then the owner cannot complete § 3.1(b) of the § 246 Application Form, exempting the project from § 246's requirements. See 2010 Order at 5 (outlining Application for a Certificate of Public Good for Temporary Meteorological Stations, Pursuant to 30 V.S.A. §§ 246 and 248, Section 3.1(b)). Section 3.1(b) allows property owners to "[p]rovide an explanation of the temporary meteorological station's relationship to the construction of an electrical generation facility that may be proposed for that location and a brief description of that facility." Id. The 2010 Order explains that § 3.1(b) of the application is to provide a basis for determining whether a tower is "reasonably related to a generation facility." 2010 Order at 4. However, this provision does not provide an exemption for property owners who do not have concrete plans for a grid-connected facility. Rather, it serves to identify whether a project has the potential for a future wind project and gives owners the opportunity to expressly state their intentions for the data and measurements obtained through erecting a temporary tower. These statements may be used to determine whether a tower is "reasonably related" to a future grid-connected project, but do not provide an exception for projects, such as Belisle's, that do not have specific plans for such a facility at the time the tower is established. Therefore, Belisle's argument that he could not have completed an application for a § 246 CPG because he would not have had specific plans to detail in § 3.1(b) of the application is without merit.[12]
¶ 37. Finally, Belisle argues that his project should not be penalized because "similar public-funded installations" through the Vermont Anemometer Loan Program (ALP) did not require a CPG. ALP was a program administered by the Vermont Technical College through a grant from the DPS in 2005 to fund wind-assessment equipment for residents, farms, and businesses considering installation of wind-power systems. However, the prior existence of the ALP, of which Belisle's tower was not a part, does not excuse Belisle's failure to comply with § 246's requirements to obtain a CPG for temporary meteorological towers, which occurred well *1245 after the PUC issued clear guidance in the 2010 Order. Belisle was required to obtain a CPG for his tower, and a reading of § 246 or the 2010 Order would have notified him of this obligation.
IV. Penalty
¶ 38. The PUC determined that Belisle violated § 248 and assessed a $ 10,000 fine pursuant to 30 V.S.A. § 30(a)(1). Belisle advocates that if the PUC determined that he violated § 246, then it should have applied 30 V.S.A. § 30(a)(2) to determine the appropriate fine. We concur that § 30(a)(2) provides the civil penalty for violations of § 246, and we accordingly remand this issue to the PUC to recalculate the fine based on § 30(a)(2).
¶ 39. Section 30(a) of Title 30 provides two categories of civil penalties for violations of that title-subsections (a)(1) and (a)(2). Subsection (a)(1) applies when "[a] person, company, or corporation subject to the supervision of the [PUC] or [DPS] ... who fails within a reasonable time to obey a final order or decree of the [PUC], or who violates a provision of ... [section] 248 ... shall be required to pay a civil penalty as provided in subsection (b) of this section after notice and opportunity for hearing." Id. § 30(a)(1) (emphasis added). Subsection (b) provides for a civil penalty of not more than $ 40,000, or, in the case of a continuing violation, not in excess of $ 100,000 or "one-tenth of one percent of the gross Vermont revenues from regulated activity of the person, company, or corporation in the preceding year." Id. § 30(b). Subsection (c) then identifies eight factors that the PUC may consider in determining the amount of the civil penalty. Thus, if a person or company is within the jurisdiction of the PUC and violates § 248, then that person or company is subject to penalty under subsection (b), and the PUC may determine the amount of the penalty based on the factors outlined in subsection (c).
¶ 40. Subsection (a)(2) provides that "[a] person who violates a provision of chapter 3 or 5 of this title, except for the provisions of section 231 or 248 of this title, shall be required to pay a civil penalty after notice and opportunity for hearing." Id. § 30(a)(2). Violations of § 246, which is a provision of chapter 5 of Title 30, are covered by subsection (a)(2). Notably, violations of § 248 are expressly exempted from the requirements of subsection (a)(2). Id. Subsection (a)(2) also outlines the scope of a civil penalty for violations of the provisions in chapters 3 and 5, such as § 246. While subsection (a)(2) partially incorporates the penalties outlined in subsection (b), it provides an alternate penalty for violations that did not cause sufficient harm. Specifically, subsection (a)(2) provides:
If the [PUC] determines that the violation substantially harmed or might have substantially harmed the public health, safety, or welfare, the interests of utility customers, the environment, the reliability of utility service, or the financial stability of the company, the [PUC] may impose a civil penalty as provided in subsection (b) of this section. If the [PUC] determines that the violation did not cause or was not likely to cause such harm, the [PUC] may impose a civil penalty of not more than $ 10,000.00.
Id. § 30(a)(2) (emphases added). Thus, if the PUC determines that the violation did not "substantially harm" the interests listed in subsection (a)(2), then the maximum penalty the PUC can impose is $ 10,000. In determining the amount of the civil penalty under subsection (a)(2) (up to $ 10,000), the PUC may also consider the eight factors outlined in subsection (c). Id. § 30(c).
¶ 41. Here, the PUC applied subsection (a)(1) to determine the penalty for Belisle's violation. However, subsection *1246 (a)(1) applies to violations of § 248 and not to violations of § 246. As explained above, Belisle's establishment of a temporary meteorological tower without obtaining a CPG is a violation of § 246 ; therefore, subsection (a)(2), not (a)(1), provides the appropriate civil penalty. We reverse and remand the issue of calculating the penalty to the PUC to determine whether "the violation substantially harmed or might have substantially harmed the public health, safety, or welfare, the interests of the utility customers, the environment, the reliability of utility service, or the financial stability of the company." Id. § 30(a)(2).[13] If so, the PUC may "may impose a civil penalty as provided in subsection (b) of [section 30 ]," and may consider the eight factors outlined in subsection (c) in so doing. Id. If the PUC determines that the violation was not likely to cause substantial harm, then it "may impose a civil penalty of not more than $ 10,000" and may consider the factors outlined in subsection (c). Id.
We affirm in part, and we reverse and remand in part for the PUC to recalculate and assess a penalty consistent with this opinion.

The PUC was previously known as the Public Service Board. See 2017, No. 53, §§ 9-13.

During the second phase, Belisle continued to argue that he was not subject to PUC jurisdiction and was not required to obtain a CPG. The PUC revisited this issue during the penalty determination and considered evidence submitted at the penalty hearing-essentially ruling on the issue twice, albeit more robustly at the penalty phase. Here, we affirm the PUC's summary judgment determination based solely on the undisputed facts before the PUC at the time of its first summary judgment determination. We note that while nothing in the evidence presented at the penalty phase alters our conclusion, it is irrelevant to our analysis.

While not defined by statute, "site preparation" includes physical acts to prepare the site for development, such as grading or disturbing the ground, clearing the area, managing erosion, and excavating. See, e.g., Muzzy v. Curtis, 127 Vt. 516, 518, 253 A.2d 149, 150 (1969) (referring to "site preparation" alongside "filling, grading, draining, installing a septic tank and field and putting in a gravel drive" in construction context); In re Village Assocs. Act 250 Land Use Permit, No. 6-1-08 Vtec (Vt. Envtl. Ct. Jan. 6, 2011), https://www.vermontjudiciary.org/sites/default/files/documents/08-006b.VillageAssocA250.dec.pdf [https://perma.cc/6RNE-MWRH] (explaining site preparation involved "erosion control" and "removal of the stumps and roots" at housing development site).

In setting the CPG requirements for temporary meteorological stations, § 246 gives the PUC the authority to carve out exceptions from the criteria for obtaining a CPG outlined in § 248. Section 246 provides: "[a] meteorological station shall be deemed to promote the public good of the State if it is in compliance with the criteria of [§ 246 ] and the Commission's rules or orders." 30 V.S.A. § 246(b). Section 246 further specifies that:
In developing rules or orders, the [PUC] ... [m]ay waive the requirements of section 248 of this title that are not applicable to meteorological stations, including criteria that are generally applicable to public service companies as defined in this title. The [PUC] shall not waive review regarding whether construction will have an undue adverse effect on aesthetics, historic sites, air and water purity, the natural environment, and the public health and safety.
Id. § 246(c)(3) (authorizing conditional waiver of certain criteria but requiring review of remaining criteria listed under § 246(c)(3), which are equivalent to criteria outlined in § 248(b)(5) ). The PUC exercised this authority and provided for a conditional waiver of certain § 248(b) requirements in its 2010 Order Establishing Standards and Procedures. State of Vt. Pub. Serv. Bd., Order Establishing Standards and Procedures [hereinafter 2010 Order], https://puc.vermont.gov /sites/psbnew/files/doc_library/standards-procedures-meteorologicaltowers.pdf [https://perma.cc/ AH8D-VC3T].
The PUC issued the 2010 Order Establishing Standards and Procedures in response to comments and requests for clarification of § 246 regarding the conditional waiver of the § 248 criteria, among other issues. The 2010 Order explained that the conditional waiver of § 248 criteria is based on the limited potential for impact presented by the majority of temporary meteorological stations under those criteria. The waiver should be conditional, not unconditional, to allow for review of a particular project if it was found to raise issues with respect to conditionally waived criteria. 2010 Order at 2.

In In re SolarCity Corp., 2019 VT 23, --- Vt. ----, 210 A.3d 1255, we held that failure to comply with the requirements of 30 V.S.A. § 219a (2016), 30 V.S.A. § 8010 (2017), and their associated regulations results in a violation of § 248. Here, failure to comply with § 246's CPG requirements for temporary meteorological stations results in a violation of § 246, not § 248. In order to avoid confusion in the future, we clarify how SolarCity differs from our opinion here.
Sections 219a and 8010 (regarding grid-connected renewable-energy systems) and § 246 (regarding temporary meteorological stations) in nearly identical terms authorize the PUC to establish CPG requirements and waive certain criteria under § 248. But they also differ significantly. Sections 219a and 8010 apply to grid-connected renewable-energy systems, which always require a CPG under § 248, whereas § 246 applies to temporary meteorological stations, which are not grid-connected and may or may not require a CPG depending on their purpose.
By the plain language of § 248(a)(2), it is a violation to construct an electricity-producing facility that connects to the electric grid without first obtaining a CPG. The petitioner in SolarCity (SolarCity) failed to comply with §§ 219a and 8010 and the associated regulations prior to installing electricity-generating solar panels. By failing to comply, SolarCity failed to obtain the required CPGs prior to construction. Thus, according to the plain language of § 248, SolarCity violated § 248 by constructing grid-connected electricity-generating systems without CPGs. In contrast, Belisle's temporary meteorological station does not generate electricity, and it may or may not require a CPG depending on whether it aided Belisle in determining whether the site was suitable for a grid-connected project. See infra, ¶¶ 26-27. A meteorological tower requires a CPG under § 246 if it is "reasonably related" to determining the site's suitability for the construction or establishment of a grid-connected, wind generation facility. Id. A meteorological tower's role-gathering data-concludes before site preparation for such a facility begins, which would trigger the CPG requirement under § 248. Therefore, even if Belisle's tower violates § 246, it does not inherently violate § 248's CPG requirements for grid-connected projects.
As explained above, applying the penalty provisions under 30 V.S.A. § 30 further supports this framework. Establishing temporary meteorological towers will not have the same kind of impact as solar panels-even small ones-that are connected to the grid. Accordingly, § 30(a)(2), which provides for lesser maximum penalties, applies to Belisle's violation of § 246, while § 30(a)(1), which provides for higher maximum penalties, applies to SolarCity's violation of § 248.

Belisle argues that he is not subject to the PUC's supervision under 30 V.S.A. §§ 203 or 209 and therefore cannot be penalized for violating § 246. However, § 246 governs the CPG requirements for establishing a temporary meteorological station, and 30 V.S.A. § 30(a)(2) explains that "[a] person who violates a provision of chapter 3 or 5 of this title, ... shall be required to pay a civil penalty after notice and opportunity for hearing." By erecting a tower that required approval under § 246, a provision of chapter 5 of Title 30, Belisle subjected himself to PUC jurisdiction under these statutes. Belisle's argument that he was not aware of these requirements and therefore should not be liable is without merit. That ignorance of the law does not excuse an individual or company from compliance with its provisions is " 'of unquestioned application in Vermont both in civil and in criminal cases.' " Citibank (S.D.), N.A. v. Dep't of Taxes, 2016 VT 69, ¶ 28, 202 Vt. 296, 149 A.3d 149 (quoting State v. Woods, 107 Vt. 354, 356-57, 179 A. 1, 2 (1935) (alterations omitted)). Although Belisle consulted VERA and his local zoning administrator, the ultimate responsibility of compliance with § 246 remained with Belisle.

The definition of "temporary meteorological station" provided in the PUC's 2010 Order differs from the definition of "meteorological station" under § 246(a). The 2010 Order specifies that a meteorological tower must be "constructed or installed in order to determine the suitability of a site for the location of a grid-connected wind turbine"-language not included in the statutory definition. Compare 2010 Order at 6, with 30 V.S.A. § 246(a). However, § 246 specifically grants the PUC statutory authority to "establish by rule or order standards and procedures governing application for" a CPG for meteorological stations. 30 V.S.A. § 246(b). The PUC did so here by electing to clarify the term "temporary meteorological station," and we defer to the PUC's construction of this term. See In re Korrow Real Estate, LLC Act 250 Permit Amendment Application, 2018 VT 39, ¶ 20, 207 Vt. 274, 187 A.3d 1125 (explaining that "court owes deference to" agency construction of policy or terms when "agency is statutorily authorized to provide such guidance"). Notably, while the PUC may promulgate rules or orders establishing standards for temporary meteorological towers, such authority is not boundless. The PUC's interpretation may not exceed the authority granted by the enabling statute or conflict with the statutory definition. Martin v. State, 2003 VT 14, ¶ 15, 175 Vt. 80, 819 A.2d 742 (explaining agency regulation may only extend as far as agency's "legislative grant of authority" and may not compromise intent of its authorizing statute); In re Conservation Law Found., 2018 VT 42, ¶ 16, 207 Vt. 309, 188 A.3d 667 ("We ... will overturn an agency's interpretation of its own promulgated regulation that exceeds the authority granted under the state enabling statute ...."). Here, the definition promulgated by the PUC does not exceed the PUC's statutory mandate or conflict with the statutory definition provided in § 246. Therefore, the definition of "temporary meteorological station" that the PUC promulgated in its 2010 Order governs our analysis in this case.

The PUC found, and the parties do not dispute, that Belisle's tower was temporary.

Belisle argues that, instead of applying the "reasonably related" test, the PUC "contends that its Section 248 jurisdiction extends to any activity that is a 'necessary precursor' to a future potential electric generation project" based on the PUC's reliance during the penalty phase on its holdings in UPC Wind Management, LLC, No. 6884, in 2004 and Vermont Electric Cooperative, Inc., No. 7201, in 2006. In UPC Wind Management, LLC, the PUC adopted the "reasonably related" test to determine jurisdiction over temporary towers pursuant to § 248 but explained that if a temporary tower is a "necessary precursor" to a wind facility, then that tower also satisfies the "reasonably related" and "directly related" standards. No. 6884. The "necessary precursor" analysis suggests that all temporary towers are within PUC jurisdiction because all temporary towers have the potential to provide data for a future wind project. The PUC has departed from this analysis, correctly, in § 246 proceedings and applies the narrower "reasonably related" test-only those temporary towers that are "reasonably related" to a future wind generation project fall within PUC jurisdiction. The PUC's jurisdictional analysis conducted during the penalty phase of the proceedings is not relevant to our review of the PUC's summary judgment determination; therefore, any error in its application of the reasonably related standard was harmless.

We note that while subsequent plans for or development of a wind generation project may be a factor in this analysis, that alone is insufficient to support a finding as to the purpose for the tower. See Meteorological Tower at 700 Kidder Hill Rd. in Irasburg, Vermont, No. 8585 (denying DPS's summary judgment motion because property owner's subsequent installation of two net-metered wind turbines, standing alone without project proponent's outward manifestations of intent, was insufficient to directly demonstrate owner installed tower to assess viability of grid-connected turbines).

Belisle also argues that there is no evidence the Swanton Wind project, in which he was an investor and developer, was contemplated in 2012 and it was clear error for the PUC to use Belisle's subsequent actions as evidence of his intent. The PUC's consideration of the Swanton Wind project occurred in its "second pass" at this issue during the penalty phase; therefore, we do not consider it in our review of whether a violation of § 246 occurred. We are limited to the undisputed facts present before the PUC during its initial summary judgment determination.

The PUC determined that elements of Belisle's proposed undisputed facts eleven, thirteen, and fourteen regarding his ability to complete § 3.1(b) of the § 246 application were "immaterial because, even if true, they are not relevant to the legal question of whether [Belisle] was required to obtain a CPG prior to erecting the tower." Belisle argues that this conclusion was in error. However, any error in the PUC's findings of undisputed facts is harmless because, even considering Belisle's alleged facts, based on the circumstances and resolving all inferences and doubts in favor of Belisle, the temporary tower at issue was reasonably related to a grid-connected project.

Belisle's arguments that there is no evidence that his temporary tower caused substantial harm to any of the factors listed under § 30(a)(2) must be addressed on remand. Therefore, we do not address it here. Similarly, we decline to address Belisle's argument that the PUC's penalty was arbitrary and capricious.